SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Steven BYERS et al., Defendants,

and

Elka Shereshevsky, Relief Defendant.

No. 08 Civ. 7104(DC).

United States District Court,
S.D. New York.

July 23, 2009.

Alistaire Bambach, Esq., Neal Jacobson, Esq., Alexander M. Vasilescu, Esq., Steven G. Rawlings, Esq., Danielle Sallah, Esq., Securities & Exchange Commission, New York Regional Office, New York, NY, for Plaintiff, Securities and Exchange Commission.

Dewey & Leboeuf LLP, by Martin J. Bienenstock, Esq., Leo V. Gagion, Esq., Mark S. Radke, Esq., Dean C. Gramlich, Esq., John K. Warren, Esq., New York, NY, for Timothy J. Coleman, Receiver for the Wextrust Entities and Affiliates.

Dechert LLP, by Shalom Jacob, Esq., Shumuel Vasser, Esq., New York, NY, for the International Ad–Hoc Committee of Wextrust Creditors.

Brown Rudnick LLP, by Martin S. Siegel, Esq., New York, NY, for the International Consortium of Wextrust Creditors.

Sullivan & Worcester LLP, by Joshua L. Solomon, Esq., Boston, MA, for G & H Partners AG.

Lemery Greisler LLP, by Paul A. Levine, Esq., Albany, NY, for Key Equipment Finance Inc.

Nesenoff & Miltenberg LLP, by Philip A. Byler, Esq., New York, NY, for Broadway Bank.

Bond, Schoeneck & King, PLLC, by Louis Orbach, Esq., Syracuse, NY, for TCF National Bank.

Mazzeo Song & Bradham LLP, by John M. Bradham, Esq., David H. Hartheimer, Esq., Peter B. Katzman, Esq., New York, NY, for Space Park AIM Partnership and Space Park ISSB Partnership.

**168**

Meyer, Suozzi, English & Klein, P.C., by Alan E. Marder, Esq., Garden City, NY, for Nashville Warehouse Partners, LLC and Southeast Warehouse Partners, LLC.

Schoeman, Updike & Kaufman, LLP, by Beth L. Kaufman, Esq., New York, NY, for Lawrence Costa.

Samuels & Bernstein LLP, by Calvin A. Bernstein, Esq., Chicago, IL, for Munden Family Partnership, LP, LLC.

Martin Malek, Brooklyn, NY, Investor Pro Se.

Kevin McKeown, Investor Pro Se.

Timothy Holmes, Investor Pro Se.

Pess Rothschild, Investor Pro Se.

Andrew Campbell, Investor Pro Se.

## *OPINION*

CHIN, District Judge.

On August 11, 2008, the Securities and Exchange Commission (the "SEC") filed the instant complaint against Steven Byers, Joseph Shereshevsky, and five Wextrust entities controlled by them (the "Wextrust entities"). The complaint alleges that Byers and Shereshevsky operated a massive Ponzi scheme that defrauded more than 1,000 investors of approximately $255 million.

The same day the complaint was filed, this Court (Sullivan, J., sitting in Part I) appointed Timothy J. Coleman (the "Receiver") as receiver over the Wextrust entities. The receivership order authorized the Receiver to, *inter alia,* ascertain the condition of, and assume managerial control over, the Wextrust entities to prevent dissipation of the receivership estate and to determine what should be done with the assets of the estate.

The Receiver, after ten months of investigation, has determined that the most prudent and equitable course of action is a liquidation of the receivership estate and distribution of the proceeds to creditors and victims of the alleged Ponzi scheme. To that end, the Receiver now moves for approval of a proposed plan of distribution (the "Plan"). The Plan was formulated in cooperation with the SEC, which supports the Plan in its entirety.

"An equitable plan is not necessarily a plan that everyone will like," *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395(RWS), 2000 WL 1752979, at *29, 2000 U.S. Dist. LEXIS 17171, at *95 (S.D.N.Y. Nov. 29, 2000), and that is indeed the case here. The Plan is controversial in many respects—including the provisions calling for liquidation of the receivership estate, and a subsequent pro rata distribution of the proceeds that draws no distinctions among investors. Reflecting the controversial nature of the Plan, more than 100 investors and creditors have lodged objections to the Plan. I held a hearing on May 21, 2009 (the "Hearing") on the Receiver's motion to approve the Plan and reserved decision.

As a District Court sitting in equity, it is my responsibility to approve a distribution plan only if it is fair and reasonable. For the reasons set forth below, I conclude that the Plan is both fair and reasonable, and it is therefore approved.

## *BACKGROUND* [1]

I discuss briefly the status of the Receiver's investigation, the different types of

---

**1.** Familiarity with the facts and procedural history of this case is assumed. I only summarize here facts and procedural history relevant to the Plan. For further recitations of the facts of this case, see the Court's prior decisions: *SEC v. Byers,* 08 Civ. 7104(DC), 2008 U.S. Dist. LEXIS 105207 (S.D.N.Y. Dec. 30, 2008); *SEC v. Byers,* 592 F.Supp.2d 532 (S.D.N.Y.2008); *SEC v. Byers,* 08 Civ.

investments in the alleged Ponzi scheme, the creditors of the receivership estate, and a summary of the Plan.

## I. The State of the Receivership

On January 15, 2009, the Receiver filed a Plan for Management of Wextrust Real Estate Portfolio (the "Management Plan"). The purpose of the Management Plan was to provide notice to investors of the Receiver's investigation as to the real estate holdings. On March 27, 2009, the Receiver submitted to the Court the Plan, the purpose of which is to establish the principles that will govern the liquidation and subsequent distribution of assets.

At the Hearing, the Receiver provided a brief status report on his investigation. The estate has approximately $15 to $20 million in cash on hand. (Tr. at 7). The majority of the cash is in the accounts of the commodity funds. (*Id.* at 70). The portfolio of commercial real estate has a book value of $250 million, with approximately $200 million in secured claims against the real estate. (*Id.*). The Receiver was careful to note that, given the state of the commercial real estate market, the current market value is almost certain to be far below the book value. (*Id.*). The Receiver expects that he would be able to liquidate the real estate portfolio within six to eighteen months, upon approval by the Court of the Plan. (*Id.*).

Although he was not able to say definitively what sort of a distribution defrauded investors could expect, the Receiver's best estimate was between 5 and 50 cents on the dollar. (*Id.* at 11).

7104(DC), 2008 U.S. Dist. LEXIS 100085 (S.D.N.Y. Nov. 25, 2008).

**2.** Indeed, as the Receiver pointed out at the Hearing, because of the conditions in the market, "the timing of this case could not have been worse." (Tr. at 14).

## II. Types of Investments

### A. The Real Estate Investments

Most of the Wextrust entities were limited liability corporations established for the purpose of owning, operating, and then selling a single real estate asset. (Management Plan at 2). The majority of the properties were purchased between 2004 and 2007—prior to the crash of the real estate market. (*Id.* at 5).[2] In some instances the perpetrators of the scheme actually did use investor money to buy specific pieces of property, but in many instances they did not, and used the money investors thought was to buy real estate for unauthorized purposes instead. (Tr. at 7–9).

There are four principal components to the Wextrust real estate portfolio, collectively referred to herein as the "Real Estate Funds":

- First, hotels, managed by an entity called Axela Hospitality, LLC. Although the hotels are valuable, they have little or no equity due to economic conditions.

- Second, commercial properties, managed by an entity called Wextrust Equity Partners. According to valuations conducted by the Receiver's advisors,[3] the fair market value of these properties is greater than the secured debt.

- Third, residential properties, managed by an entity called Wextrust Development Group, LLC. The fair market value of these properties is less than the secured debt.

**3.** The valuations are not disclosed in the Management Plan, as the Receiver believes that publicly disclosing those values would adversely affect his ability to sell them at the highest possible price. (*Id.* at 10).

■ Finally, the portfolio of high yield real estate loans, held by various affiliates. A majority of these loans are in default. (Management Plan at 4–10).

Based on the valuations, market conditions, and the advice from his accountants, attorneys, and financial advisers, the Receiver concludes as follows:

The Receiver has determined that there is little, if any, going concern value in the Wextrust real estate operations as a whole, and that any such value is far outweighed by the substantial risk of loss that would be involved in continuing to operate the properties for an extended period.

(*Id.* at 3). For those assets where a sale would be imprudent—due to the fact that the fair market value has fallen below the amount of the secured creditors' interests—the Receiver will attempt to renegotiate or restructure the secured debts and/or assist the secured creditors in selling the properties. (Plan at 2).

### B. *The Commodity Funds Investments*

There are four Wextrust commodity funds: (1) the WexTrade Principal Protected Fund I, LLC (the "WPP Fund"); (2) the WexTrade Diversified Futures Fund I, LLC (the "WDF Fund"); (3) the WexTrade Principal Offshore Fund I, Ltd. (the "WPO Fund"); and (4) the WexTrade Diversified Offshore Futures Fund I, Ltd. (the "WDOF Fund") (collectively, the "Commodity Funds"). (12/19/08 Schmeltz Decl. ¶ 4). The offerings for the four Commodity Funds raised approximately $17 million, spread across the four funds as follows: $3,380,000 for the WPP Fund; $11,817,022.21 for the WDF Fund; $325,000 for the WPO Fund; and

$1,422,475 for the WDOF Fund. (12/19/08 Sordillo Decl. ¶ 10).

The Commodity Funds were managed by WexTrade Commodity Managers LLC ("WCM"). (12/18/08 Adrian Decl. ¶ 10). WCM was registered with the Commodity Futures Trading Commission (the "CFTC") and the National Futures Association (the "NFA"). (*Id.* ¶ 13). WCM, in turn, was managed by Wextrust Capital, LLC, a named defendant in this case. (*Id.*).

The Commodity Funds traded through what is called a "master-feeder" structure, under which WCM allocated a percentage of the offering proceeds of each fund to a master fund. (*Id.* ¶¶ 10–11). The master fund then allocated that money to traders who used it to speculate in commodity futures such as energy, metals, and grains. (*Id.*). WCM monitored the performance of the traders on a daily basis. (*Id.* ¶ 12).

The Commodity Funds began trading in September 2007. (*Id.* ¶¶ 9, 10). The Commodity Funds made real trades with real assets. (Tr. at 62). When the SEC filed its complaint on August 11, 2008, all trading positions in the Commodity Funds were liquidated, leaving a substantial amount of cash. (12/18/08 Adrian Decl. ¶ 14).[4] It is the largest pool of cash in the receivership estate, and has been used to pay administrative expenses of the estate. (12/19/08 Schmeltz Decl. ¶ 13).

### C. *The Diamond Mine Investments*

From 2006 to 2008 Shereshevsky and Byers conducted six securities offerings to invest in diamond mines in South Africa and Namibia, ultimately raising $54 million. (1/30/09 Decision at 2). According to evidence uncovered by the Receiver, of the $54 million raised, approximately $40 mil-

---

4. The number $17.5 million was used at the Hearing (tr. at 63), but the Court has been

unable to verify the precise amount in the record.

lion was transferred to a South African company called Pure African Minerals (Pty) Limited. (*Id.*). The Receiver has been unable to ascertain precisely what happened to the $40 million, and has commenced litigation in South Africa to gain access to the relevant books and records. That litigation is still ongoing, and the Receiver intends to aggressively pursue any Wextrust assets in Africa. (*Id.;* Plan at 3).

## III.  Types of Creditors

While it is not clear from the record precisely how many creditors of the Wextrust entities exist, it is clear that the number of creditors, and the debts owed those creditors, is substantial.

### A.  Secured Creditors

The secured creditors fall into two categories: Those creditors holding perfected liens on collateral, and those creditors with a partnership interest in a specific property. (Plan at 29–30). Both types of secured creditors have recourse against specific collateral, and must be paid out of the proceeds of that collateral. (*Id.* at 30). In general, the Receiver expects the secured creditors to fare better—proportionally speaking—than any other claimants. (*Id.*)

### B.  Unsecured Creditors

Unsecured creditors are vendors and similar parties who do not have secured claims against the receivership estate. (*Id.* at 37). The Receiver has been paying ordinary and necessary expenses as they come due, but has determined that, in certain—unspecified—instances,  paying some invoices is not necessary to preserve the value of the receivership estate. This latter group of unsecured creditors, as well as any outstanding claims not yet submit-

ted to the Receiver, will be eligible for a distribution under the Plan on the same terms as the defrauded investors. (*Id.* at 37–38).

## IV.  Summary of the Plan

The Plan contemplates a series of distributions.  Upon approval of the Plan by the Court, the Receiver will make an immediate distribution from the cash assets of the estate, which will be followed by subsequent distributions from the sale of the receivership assets.  (Plan at 1).

### A.  Liquidation of the Receivership Estate

While neither the Management Plan nor the Plan uses the word liquidation, a liquidation of the assets controlled by the Receiver is clearly what is contemplated.[5]

### B.  Pro Rata Distribution

The Plan proposes a pro rata distribution of assets, under which each investor would receive a distribution based on a certain percentage—not yet determined—of the amount originally invested. (Plan at 7–17).

### C.  Calculation of Investors' Pro Rata Distribution

The Plan proposes that distributions be calculated based on the "net investor method." (*Id.* at 11). Under this approach, any cash distributions received prior to the SEC's filing of this suit would be subtracted from the total amount invested and that would be the starting point for the pro rata distribution. The method is illustrated by the following examples:

- ■ Investor A had a gross investment of $100,000 and received a cash dis-

---

**5.** The fact that the Plan is effectively a liquidation is buttressed by the Receiver's and SEC's defense of this Court's authority to approve a liquidation. (*See* Receiver Response to Objections at 33–34; SEC Statement in Support at 4–5).

tribution of $20,000. His net investment amount would be $80,000. Assuming a pro rata multiplier of 10%,[6] Investor A's distribution would be $8,000.

■ Investor B had a gross investment of $250,000 and received a cash distribution of $50,000. Her net investment amount would be $200,000. Assuming a pro rata multiplier of 10%, Investor B's distribution would be $20,000.

The Receiver recommends the net investor method on the ground that it would be the most equitable.

The Plan also proposes that any distributions investors chose to roll over into the funds—rather than receive in the form of cash—be added to the baseline amount for calculating their distribution under the Plan. (*Id.* at 12). In other words, the Plan would treat a rolled-over distribution as an out-of-pocket loss. The following examples illustrate the proposal:

■ Investor A had a gross investment of $100,000. Rather than take a cash distribution, he rolled over $20,000 back into his Wextrust investment. His net investment amount would be $120,000. Assuming a pro rata multiplier of 10%, Investor A's distribution would be $12,000.

■ Investor B had a gross investment of $100,000. Investor B took a cash distribution of $20,000 at one point, and later rolled over $50,000. Her net investment amount would be $130,000. Assuming a pro rata multiplier of 10%, Investor B's distribution would be $13,000.

The formula the Receiver proposes, then, is as follows:

[ (Total Out of Pocket Cash Investment Paid Into Wextrust Scheme) + (Roll–Over Distributions–Cash Distributions) ] * Pro Rata Multiplier

(*Id.*).

### D. *Procedure for Calculating Distribution*

The Plan proposes the following priority of claims: (1) administrative claims of the estate (including fees for the Receiver, his attorneys and advisers); (2) tax liabilities of the estate; (3) secured creditors; and (4) unsecured creditors and defrauded investors. (Plan at 27). The Plan sets forth two procedures for calculating the amount of distribution: One for defrauded investors, and one for creditors.

Since the Receiver's appointment, he and his advisers have been reviewing documents and interviewing investors to compile information regarding each investor. (*Id.* at 32). Beginning on May 15, 2009, the Receiver began sending statements to defrauded investors setting forth what the Receiver believes to be their total investments, and their recovery based on the net investor method, discussed above. Investors had until June 30, 2009 to respond to these statements. If they did not respond, the Receiver was to presume they had no objection to their statements. If there was a dispute, the Receiver and the investor were to attempt to resolve it by August 7, 2009.[7] Any dispute that could not resolved would be brought before the Court.

As to creditors, the Receiver proposes a slightly different procedure for claim adju-

---

**6.** Solely for simplicity, the Court will use 10% as the pro rata multiplier throughout this Opinion. The Receiver has not yet determined what the pro rata multiplier will be, and the Court's use of 10% should not be deemed an endorsement of that amount.

**7.** By Order dated July 23, 2009, I extended that date to thirty days after entry of this Opinion.

dication. All creditors, whether secured or unsecured, had to submit detailed records to the Receiver by June 30, 2009. The Receiver was to then post a spreadsheet of all claims on his website by July 7, 2009, from which the creditors could then dispute the amounts. The parties would attempt to resolve any disputes on their own by August 7, 2009,[8] after which remaining disputes would be decided by the Court. (Plan at 38–39).

### E. *Exclusion of Deficiency Claims*

As to the secured creditors, the Plan proposes that, in the event that the amount of the sale of the collateral is less than the secured creditors' claims—a likelihood, given the significant drop in the commercial real estate market—the Court prohibit the secured creditors from seeking to recoup deficiency claims against the receivership estate as a whole. (*Id.* at 29–30). Instead, the Receiver proposes that the secured creditors be required to attempt to recoup any deficiency from the property-specific limited liability holding company. (*Id.*). In other words, the Plan proposes that the deficiency claims be excluded entirely from the distribution.

### F. *Disqualification of Wextrust Employees*

The Receiver proposes that the defendants, their relatives, and "individuals such as Wextrust employees who actively participated in the development, implementation, and/or marketing of the fraudulent scheme" be disqualified from receiving a distribution under the Plan, or have their distribution significantly reduced, based on their level of involvement in the Ponzi scheme, and any commissions and/or finder's fees they may have received. (*Id.* at 33–34). The Receiver believes that employees and others who participated in the

scheme are not similarly situated to the victims of the Ponzi scheme.

The Plan proposes that any party who is disqualified from receiving a distribution be put on notice of this fact and have the opportunity to contest the determination. The Court will, as necessary, resolve any disputes.

## DISCUSSION

I begin by addressing the Court's jurisdiction over this case. I then discuss whether I have the authority to approve the Plan. Next I address the various objections made to the Plan, ruling on each in turn. I conclude that the Plan is fair and reasonable, with one exception.

### I. *Authority of The Court to Approve the Plan*

#### A. *Jurisdiction*

The International Consortium of Wextrust Creditors (the "Consortium") argues that the Court no longer has jurisdiction over this case. The basis for the Consortium's argument is an appeal pending before the Second Circuit of one of the Court's prior decisions in this case. In support of its argument the Consortium cites cases setting forth the general proposition that the filing of a notice of appeal divests the district court of jurisdiction as to the matters being appealed. *See, e.g., Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal ... confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *McCue v. City of New York,* 503 F.3d 167, 169 (2d Cir.2007) (citing *Griggs* for same proposition).

---

**8.** This date was also extended to thirty days after entry of this Opinion.

■ As the Receiver points out, however, the Consortium ignores controlling case law that flatly contradicts its argument. While the general proposition the Consortium sets forth is correct, it does not apply in a case where, as here, the decision being appealed involves a preliminary injunction. *See Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir.1996) ("Although the filing of a notice of appeal ordinarily divests the district court of jurisdiction over issues decided in the order being appealed, jurisdiction is retained where, as here, the appeal is from an order granting or denying a preliminary injunction."); Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 11A Federal Practice and Procedure: Civil § 2962, at 438 (3d ed. 2005) ("An appeal from the grant or denial of a preliminary injunction does not divest the trial court of jurisdiction or prevent it from taking other steps in the litigation while the appeal is pending.").

Accordingly, the Court continues to have jurisdiction over this case.[9]

## B. *The Court's Authority to Approve a Distribution Plan*

■ In general, this Court has broad authority to craft remedies for violations of the federal securities laws. *See Official Comm. of Unsecured Creditors of World-Com, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir.2006); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997). Courts have held that within that broad authority lies the power to approve a plan of distribution proposed by a federal receiver. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82–83 (2d Cir.2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"); *SEC v. Wang*, 944 F.2d 80, 88 (2d Cir.1991) (same); *see also SEC v. Forex Asset Mgmt. LLC*, 242

F.3d 325, 332 (5th Cir.2001) ("Because we find that the district court did not abuse its discretion when it approved the Receiver's plan, we AFFIRM."). The Court has the authority to approve any plan provided it is "fair and reasonable." *Wang*, 944 F.2d at 81 (distribution plan should be "reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable"); *see also SEC v. Enter. Trust Co.*, No. 08 Civ. 1260, 2008 WL 4534154, at *3, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D.Ill. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

## C. *The Court's Authority to Approve a Liquidation Plan*

The Court's equitable authority extends to approving the Plan, for the following four reasons.

First, as just discussed, the Court has broad equitable authority when considering a plan of distribution in a case such as this.

Second, in *Credit Bancorp*, the Second Circuit approved a distribution plan that was effectively a liquidation of a defendant's assets. 290 F.3d at 90. In the District Court opinion affirmed by the Second Circuit, Judge Sweet considered several different plans of distribution. While observing that "an equity receivership should not be employed as a substitute for a bankruptcy proceeding to effectuate the liquidation of a defendant firm," *Credit Bancorp*, 2000 WL 1752979, at *27, 2000 U.S. Dist. LEXIS 17171, at *89, Judge Sweet nonetheless approved a distribution plan that called for the "partial" sale and

---

**9.** I also reject the Consortium's request, made in the alternative, to stay these proceedings in the interest of fairness. The interest of fairness overwhelmingly weighs in favor of a prompt resolution of this case and a distribution of assets to defrauded investors.

distribution of assets of a defendant in a Ponzi scheme. *Id.* The plan could only be characterized as "partial" due to the fact that "the Receiver has not yet been able to marshal and bring under his control all Credit Bancorp assets." *Id.* at \*27, 2000 U.S. Dist. LEXIS 17171 at \*88. Moreover, the plan also expressly contemplated the possibility of additional distributions. *See id.* at \*47, 2000 U.S. Dist. LEXIS 17171 at \*161 ("There is nothing inherent in the [plan] which precludes future distributions. Indeed, if the Receiver is successful in [an action to recoup assets] then there may be significant additional funds.").

There does not appear to be any difference between the Plan at issue in this case and the plan Judge Sweet approved in a decision affirmed in its entirety by the Second Circuit.[10] Both call for the liquidation of assets under the control of a federal receiver, with the understanding that when the receiver assumes control over additional assets, they too will be distributed. Moreover, while not addressing the precise issue before me, at least one District Court has interpreted *Credit Bancorp* as extending a District Court's equitable jurisdiction under circumstances such as these. *See SEC v. Shiv,* 379 F.Supp.2d 609, 617 (S.D.N.Y.2005) (interpreting *Credit Bancorp* as follows: "The Second Circuit ... *therefore extended the Receiver's equity jurisdiction* to trace and repatriate funds from many discrete accounts, through an entity from which the funds had been diverted, back to the rightful owners, ratably in proportion to their losses.") (emphasis added).

Third, this case was brought by the SEC—the agency charged with enforcing the federal securities laws. *See Official Committee of Unsecured Creditors of*

*WorldCom, Inc.,* 467 F.3d at 82. The Plan was drafted in consultation with the SEC, the SEC fully supports the Plan, and, in the SEC's view, the Plan "is consistent with Second Circuit and other legal authority." (SEC Statement in Support at 1). The SEC's judgment is entitled to deference from this Court. *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 34 n. 6 (2d Cir.2005), *vacated on other grounds,* 547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). In addition, the Receiver fully supports the Plan, and the Court may give weight to the Receiver's judgment. *See CFTC v. Eustace,* No. 05 Civ. 2973, 2008 WL 471574, at \*5–6, 2008 U.S. Dist. LEXIS 11810, at \*17 (E.D.Pa. Feb. 15, 2008).

Fourth, equity compels approval of the Plan. *Cf. SEC v. TLC Invs. & Trade Co.,* 147 F.Supp.2d 1031, 1036 (C.D.Cal.2001) (approving liquidation plan in receivership on equitable grounds). The only alternative to the liquidation contemplated by the Plan is bankruptcy. The Receiver has considered a bankruptcy filing, and believes it would be inequitable. Although the question is a close one that gives me pause, in the end I agree.

This is an SEC fraud case involving a massive Ponzi scheme. The reason the Wextrust entities are in shambles is not—as is typical in a bankruptcy case—because of poor economic conditions or garden variety mismanagement. The reason is fraud. The principals of the Wextrust entities are accused of effectively looting the business for their own personal gain, and in the process defrauding hundreds of investors who trusted them with their hard-earned savings. They have been indicted for their alleged crimes. *See United States v. Byers, et al.,* No. 08 Cr. 1092 (S.D.N.Y. Aug. 8, 2008). Under these cir-

---

**10.** To be clear, the Second Circuit never directly addressed whether the plan Judge Sweet addressed ran afoul of dicta cautioning District Courts not to use receivership proceedings to liquidate estates.

cumstances, it would be inequitable to force the case into bankruptcy, where the bankruptcy court would have less flexibility in determining the most equitable approach to distribute assets to victims. The overriding goal of these proceedings should be fairness to the defrauded investors, and forcing this case into bankruptcy would, I believe, be inconsistent with that goal.

A number of creditors argue that this Court lacks the authority to approve a liquidation plan based on Second Circuit dicta cautioning that, in general, a District Court should not permit a receivership proceeding to evolve into a liquidation proceeding. *See, e.g., Eberhard v. Marcu,* 530 F.3d 122, 131 (2d Cir.2008) (noting, in dicta, that "we have expressed strong reservations as to the propriety of allowing a receiver to liquidate [an estate]") (internal citations and quotations omitted) [11]; *SEC v. Am. Board of Trade, Inc.,* 830 F.2d 431, 436 (2d Cir.1987) (noting, in dicta, that "equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws" but nonetheless affirming District Court's approval of liquidation plan). Dicta is not controlling, however, and, in any event, the Second Circuit's decision in *Credit Bancorp* casts serious doubt on the dicta in *Eberhard* and *American Board of Trade.*

Accordingly, based on the unique facts of this case, I conclude that my equitable authority extends to approving a liquidation of the receivership estate.

## II.  *Objections to the Plan*

I now discuss the objections to the Plan, guided by the principle that, in cases such

as these, "equality is equity." *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (holding, in original Ponzi scheme case, that circumstances of Charles Ponzi's scheme "call strongly for the principle that equality is equity").

Many of the objections are made by investors attempting to assert a superior claim to the receivership *res* so that they can recoup their entire investment. This is not surprising, and anyone in the unfortunate—and, in some cases, desperate— situation as the investors would undoubtedly do the same. For a District Court sitting in equity, however, it is important to remember that each investor's recovery comes at the expense of the others. As the Second Circuit has acknowledged, "[w]hen funds are limited, hard choices must be made." *Official Committee of Unsecured Creditors of WorldCom, Inc.,* 467 F.3d at 84 (internal citation and quotations omitted). Such is the case here, and the choices are indeed hard. [12]

### A.  *Pro Rata Distribution*

Many objections argue that a pro rata distribution is unfair, and that the distribution should instead be made based on level of risk, timing of investment, tracing analysis, or some other factor. In recommending pro rata distribution, the Receiver considered all options, and concluded that a pro rata distribution was the most equitable. (Plan at 8–9).

■ The Receiver's recommendation is supported by the case law, which is quite clear that pro rata distributions are the most fair and most favored in receivership cases. Indeed, the Second Circuit has ex-

---

**11.** While *Credit Bancorp* preceded *Eberhard* by six years, the Court in *Eberhard* did not cite or consider *Credit Bancorp.*

**12.** To cite one particularly difficult example, at the Hearing the Court heard from Andrew

Campbell, who invested $100,000 in one of the Commodity Funds just 35 days before the SEC filed the complaint and froze the funds. (Tr. at 79–80).

plicitly held that "the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme, in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *Credit Bancorp*, 290 F.3d at 89 (internal citation and quotations omitted); *see also SEC v. Infinity Group Co.*, 226 Fed.Appx. 217, 218 (3d Cir.2007) ("[T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions.").

The alternatives to pro rata distribution that have been proposed would create unfair results by rewarding certain investors over others based on arbitrary factors. *Cf. Credit Bancorp*, 290 F.3d at 89 (noting that, in Ponzi schemes, "whether at any given moment a particular customer's assets are traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first'") (quoting *United States v. Durham*, 86 F.3d 70, 72 (5th Cir.1996)). Tracing analysis—proposed by a number of objectors—in particular has been almost universally rejected by courts as inequitable. *See, e.g., id.* (rejecting tracing as inequitable); *United States v. 13328 & 13324 State Highway 75 N.*, 89 F.3d 551, 553 (9th Cir.1996) (holding that tracing would "frustrate equity"); *Durham*, 86 F.3d at 73 (holding that "following the tracing principle would be inequitable"); *SEC v. Elliott*, 953 F.2d 1560, 1569 (11th Cir.1992) (rejecting tracing as inequitable). The Receiver considered and rejected tracing, based on equitable grounds and on the recommen-

dation of his accountants that tracing would be "difficult, time-consuming, and expensive—and the ultimate benefit to the estate would be minimal at best." (*Id.* at 8).

### 1. Criteria for Implementing Pro Rata Distribution

The Second Circuit in *Credit Bancorp* set forth two factors that must be satisfied to approve a pro rata distribution. First, investors' funds must have been commingled. Second, the victims must be similarly situated "with respect to their relationship to the defrauders." *Id.* at 88–89. I conclude that both factors are satisfied in this case.[13]

#### a. Commingling

##### (i) Applicable Law

The extent of commingling necessary to satisfy this requirement is unclear, and no case addresses it at any length. There are, however, cases in which courts have addressed commingling in different contexts and concluded that, due to the fungibility of money, *any* commingling is enough to warrant treating all the funds as tainted. *See, e.g., United States v. Garcia*, 37 F.3d 1359, 1365–66 (9th Cir.Cal.1994) (holding, under money laundering statute—18 U.S.C. § 1956—that "presence of some tainted funds in the commingled account is sufficient to taint" legitimately-acquired funds in same account); *SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167, 181 (D.D.C.1998) ("[W]hen legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust may extend over the entire asset pool.").

A recent decision from the Southern District of Florida is particularly instructive. In *SEC v. Lauer*, the District Court

---

**13.** Although not identified as a requirement for pro rata distribution by the Second Circuit in *Credit Bancorp*, the Receiver also notes that the substantial evidence of lack of adherence to corporate form by the Wextrust entities supports a pro rata distribution. (Plan at 13–14).

denied a motion by the defendant to lift an asset freeze order as to certain assets in a bank account. No. 03 Civ. 80612(KAM), 2009 WL 812719, at *1, 2009 U.S. Dist. LEXIS 23510, at *4 (S.D.Fla. Mar. 25, 2009). In denying the motion, the District Court specifically rejected the defendant's argument that, because some of the money in a bank account was not attributable to any illicit activity, it was not properly subject to the asset freeze order. Quoting the Eleventh Circuit, the Court held that " '[b]ecause money is fungible, the government must prove only that the tainted proceeds were commingled with other funds,' " and that was sufficient to taint all of the funds. *Id.* at *5, 2009 U.S. Dist. LEXIS 23510 at *15 (quoting *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir.1999)).[14]

The Court is aware of only one decision dealing with a federal receivership in which a court addressed the extent of commingling. In *Eustace*, the District Court, without discussion, approved a pro rata distribution plan even where the evidence of commingling was "not necessarily systematic." 2008 WL 471574, at *7, 2008 U.S. Dist. LEXIS 11810, at *22.

### (ii) *Application*

As to the Real Estate Funds investors,[15] regardless of the appropriate standard of commingling to apply, this requirement is satisfied. The Receiver's investigation has revealed that there was extensive commingling. According to an analysis performed by Deloitte Financial Advisory Services LLP ("Deloitte"), of 78 discrete

real estate funds, 5 funds did not raise any money, money raised in connection with 62 funds was commingled, and 11 funds lacked enough information to make a determination. (2/11/09 Sordillo Decl. ¶ 9). Under any standard of commingling, where 62 out of 78 funds—almost 80%— are commingled, this requirement is satisfied.

As to the Commodity Funds, the Receiver argues that the commingling in the Commodity Funds was "pervasive," relying on the conclusion of its accountant that "the commingling in the Commodity Funds fits a consistent pattern in which the principals of Wextrust would move money throughout the corporate family without regard to any corporate formalities." (12/19/08 Sordillo Decl. ¶ 25). The Receiver's counsel acknowledged at the Hearing, however, that "the amount of commingling between and among the commodity funds was probably less than what occurred in other investment vehicles." (Tr. at 87). This is consistent with the position of the Commodity Funds investors, many of whom acknowledge that some commingling occurred, but maintain that it was very limited.

As discussed below, there is some evidence that commingling occurred, and the law does not appear to require more than that. Accordingly, the commingling requirement is satisfied as to the Commodity Funds.

On May 19, 2009, the NFA, the self-regulatory organization of the commodities industry, filed a complaint (the "NFA

---

**14.** The standard in *Lauer* was only whether the SEC had probable cause to freeze the assets. *See id.* at *2 n. 1, 2009 U.S. Dist. LEXIS 23510 at *8 n. 1 ("To secure a pre-trial order restraining a defendant from using potentially forfeitable assets to pay counsel of his choice, the government need only show probable cause to believe that the assets at issue are tainted by the defendant's alleged fraud.").

**15.** For the purposes of this analysis, the Court considers the diamond mine investments as part of the Real Estate Fund investments, on the ground that investments in the diamond mines were made on the same terms as investments in the Real Estate Funds, and there was as much commingling of the funds raised for the diamond mine investments as the Real Estate Funds investments. (Plan at 3, 12–13).

Complaint") against the managers of the Wextrust commodities funds. (*See In the Matter of Wextrade Commodity Managers LLC and Paul Adrian,* NFA Case No. 09–BCC–009 (May 19, 2009)).[16] One of the counts in the complaint is for commingling of assets, and it provides details of multiple instances of commingling in violation of NFA rules. (*See id.* ¶¶ 14–31). For example, on August 13, 2007, Joseph Shereshevsky allegedly authorized a transfer from one of the Commodity Funds to a Wextrust capital fund—which is not a commodity fund—in the amount of $472,000 with a notation that the transfer was "to help fund Aug 15th Payroll Chicago–Norfolk." (*Id.* ¶ 20).

While the allegations in the NFA complaint are just that—allegations—they are consistent with the Receiver's own investigation, which found multiple instances of commingling. In early 2007, for example, Lawrence Costa, then an investor in a Wextrust real estate fund, requested that $400,000 be transferred from his investment in the real estate fund into the WDF Fund. (12/19/08 Sordillo Decl. ¶ 11). At that time, however, the balance in Costa's real estate fund was only $156,711.17,[17] so to facilitate the transfer, Wextrust used money it obtained from a January 5, 2007 transfer from a real estate account—in which Costa was not an investor—into a Wextrust capital account. (*Id.*). On January 10, 2007, the $400,000 that originated in an account in which Costa was not an investor was transferred from the Wextrust capital account into Costa's real estate account, and from there into the WDF Fund in Costa's name. (*Id.*). The Receiver's investigation has revealed a number of

instances of commingling such as this. (*See, e.g., id.* ¶¶ 12, 16, 18, 19, 22).

Thus, the argument, advanced by the Commodity Fund investors, that their money cannot have been commingled because, when the SEC commenced this action, the money was still there misses the mark. Their argument presumes that the money in Commodity Fund accounts is "their" money, when, in fact, given the commingling that occurred, in all likelihood it includes money transferred from an investor who never had any intention of investing in a commodity fund. The evidence of some commingling in the Commodity Funds suggests that it is merely a coincidence that the Commodity Funds were not commingled as extensively as the Real Estate Funds—and coincidence cannot be a basis to treat the Commodity Funds investors more favorably than the Real Estate investors. *See SEC v. George,* 426 F.3d 786, 799 (6th Cir.2005) ("The mere coincidence that the defendants chose the relief defendants (instead of others) to receive funds contributed by other investors in order to delay the discovery of this scheme does not entitle the relief defendants to preferential treatment."). This is so even though, at the time they made their investment, the Commodity Funds investors believed they were making a safe and regulated investment.

Thus, the evidence of commingling is sufficient to satisfy the first prong of the *Credit Bancorp* test.

### b. *Similarly Situated*

#### (i) *Applicable Law*

To determine whether parties are similarly situated, the Second Circuit has held,

---

16. There was a suggestion at the Hearing that the CFTC might take an official position against the Plan (Tr. at 68–70), but by letter dated May 26, 2009, the SEC informed the Court that the CFTC would not take a position—one way or the other—on the Plan.

17. While not specified in the record, presumably some wrongdoing occurred if Costa believed, or claimed that, he had $400,000 in his account when, in fact, he had less than half that amount.

in different contexts, that "their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.2001) (holding that similarly situated does not mean identical, but rather similar "in all material respects").

### (ii) *Application*

The Receiver cites five reasons in support of his conclusion that the Real Estate Funds investors were similarly situated. First, the role played by Wextrust Capital was common to all the investments, in that Wextrust Capital managed the various Wextrust entities and affiliates in exchange for management fees. (Plan at 12). Second, the offering materials all explicitly stated that the investments entailed a high degree of risk. Third, the offering materials highlighted the role played by defendants Byers and Shereshevsky as well as other Wextrust personnel. Fourth, cash from the operations was routinely pooled to pay for operating expenses and distributions across various offerings. Finally, many of the securities offerings were backed by guarantees that they were backed by Wextrust Capital. (Plan at 12–13). I agree that the circumstances under which the Real Estate Funds investors made their investments was sufficiently close to satisfy this requirement.

It is a much closer call as to the Commodity Funds investors, but there, too, I conclude that the requirement is satisfied.

The Commodity Funds investors argue that they are not similarly situated to the Real Estate Funds investors in three principal respects. First, they argue that the commodities laws circumscribe the Court's discretion, and prevent it from approving the Plan. Second, they argue that the Commodity Funds should not be part of the receivership estate because they were not part of the Wextrust fraud. Finally, they argue that the Commodity Funds should not be part of the receivership estate because the Receiver lacks the authority to assert claims against the Commodity Funds.

As to the first argument, it is meritless. Federal courts regularly appoint receivers and approve distribution plans in cases involving violations of the federal commodities laws. *See, e.g., CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1116 (9th Cir. 1999) (approving receiver's distribution plan in case brought by CFTC for violation of commodities laws); *CFTC v. Rolando*, No. 08 Civ. 0064(MRK), 2008 U.S. Dist. LEXIS 101225, at *2 (D.Conn. Dec. 10, 2008) (same); *Eustace*, 2008 WL 471574, at *1, 2008 U.S. Dist. LEXIS 11810, at *2 (same).

As to the argument that the Commodity Fund investors are not similarly situated to the Real Estate investors because Wextrust did not exercise control over the Commodity Funds, it is belied by the evidence, which clearly shows that Shereshevsky and Byers exercised control over the Commodity Funds, and that they used the Funds as part of one overarching scheme to defraud investors. First, Byers was a principal of both WCM—the manager of the Commodity Funds—and Wextrust Capital—a named defendant in this case that also had the exclusive right to manage WCM. (*See* NFA Complaint ¶ 3; Receiver Response at 23). Second, Shereshevsky exercised a significant amount of control over the funds, as evidenced by his ability to have funds transferred back and forth between the Real Estate and Commodity Funds. (12/19/08 Sordillo Decl. ¶ 19, 20 (detailing transfers made at Shereshevsky's request)).[18] Third, a substantial

---

18. At the Hearing, Martin Malek, an investor   in one of the Commodity Funds, argued that,

number of Commodity Funds investors also invested in Real Estate Funds. (*See* 5/11/09 Sordillo Decl. Ex. A (49% of investors in WDF and 56% of investors in WPP also invested in Real Estate Funds)). Finally, a December 5, 2006 Wextrust Capital press release refers to the "development of Wextrust Capital's new commodity based investment funds." (5/11/09 Schmeltz Decl. Ex. C). It is therefore clear that the Commodity Funds were, together with the Wextrust entities, part of a "unified scheme to defraud," and therefore are properly part of the receivership estate. *See SEC v. AmeriFirst Funding, Inc.*, No. 07 Civ. 1188, 2008 WL 919546, at *4, 2008 U.S. Dist. LEXIS 20044, at *12 (N.D.Tex. Mar. 13, 2008) (holding that "a pooled distribution is equitable when the separate legal entities were involved in a unified scheme to defraud"); *Eustace*, 2008 WL 471574, at *8, 2008 U.S. Dist. LEXIS 11810, at *22 (approving pro rata distribution plan where structure of scheme "encouraged investors to perceive the funds as a part of a whole").

Finally, the Commodity Funds investors argue that the Receiver cannot include the Commodity Funds within the receivership estate because he only stands in the shoes of WCM, and therefore cannot assert a claim WCM would not be able to assert. This argument is premised on a misunderstanding of the Receiver's role. The Receiver is charged with protecting the interests of all investors in the Wextrust entities, and he has the authority to assert claims on behalf of any of those entities. Thus the Receiver not only has the authority, but also the duty, to assert claims against the Commodity Funds on behalf of the Real Estate Funds investors whose assets were commingled with the Commodity Funds. *Cf. Credit Bancorp*, 2000 WL 1752979, at *19, 2000 U.S. Dist. LEXIS 17171, at **61–62 (rejecting almost identical argument by investors and characterizing it as another "attempt to have their claims considered in isolation from those of the other customers").

For these reasons, I conclude that all investors are similarly situated. Both factors set forth by the Second Circuit in *Credit Bancorp* are therefore satisfied, and a pro rata distribution is appropriate.

## B. *Method of Calculating the Pro Rata Distribution*

The Receiver considered three other methods of calculating the pro rata distribution before concluding that the net investor method would be the most equitable.

First, the Receiver could simply ignore any distributions investors received, and base his calculation on the amount of the gross investment. The Receiver does not believe this would be an equitable option due to the number of investors who re-

---

under the Receiver's logic, if one of Bernard L. Madoff's investors had received a cash distribution from Madoff and subsequently invested it in the Fidelity Magellan Fund—one of the largest mutual funds in the world—then the entire Magellan Fund would be tainted, and could be distributed to Madoff victims. (Tr. at 63–64). This argument misses the mark. In the hypothetical posed, Madoff was not in control of the Magellan Fund. Here, however, there is evidence that Byers and Shereshevsky were running both the Real Estate Funds and the Commodity Funds. This case, therefore, is distinguishable from those cases in which courts have permitted investors to recoup investments both because they were traceable and because they had never been placed under the control of the perpetrator of the fraudulent scheme. *See Credit Bancorp*, 290 F.3d at 90 (rejecting similar argument on ground that "[i]n those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control.").

ceived distributions. (Receiver Response at 9). In other words, ignoring distributions would inequitably reward those who already received some money back at the expense of those who never received a distribution.

Second, the Court could order investors to repay all the cash distributions they received from the Wextrust entities, and then the Receiver could make a distribution based on each investors' actual investment. The practical problems associated with this approach, however, preclude it from being a viable option. Many of the investors may not have the money, and litigation to collect it would be expensive, time-consuming, and, in some instances, cruel. (*Id.* at 10).

Third, the Court could order what is known as the "rising tide" approach. Under this approach, the amount of an investor's received cash distributions would be deducted, dollar for dollar, from the amount of the investor's total distribution award. (*Id.* at 10). For example, assume Investor A had a gross investment of $100,000, and had received $15,000 in cash distributions. If the pro rata multiplier were 10%, then Investor A would be entitled to $10,000. Because Investor A received $15,000 in cash distributions, however—more than the distribution amount—he would not actually receive a distribution at all. (*Id.*). Deloitte, the Receiver's accountant, has estimated that, assuming a 10% multiplier, using the rising tide approach would mean that 45% of investors would receive no distribution. For this reason, the Receiver does not recommend this approach. (*Id.*).

▮ I agree that the net investor method is the most equitable. It would provide the greatest number of investors with the greatest recovery possible without inequitably rewarding some investors at the expense of others.

### C. *Treatment of Rolled–Over Distributions*

▮ Several objections have been raised to one aspect of the net investor method—namely, its treatment of rolled-over distributions. The objection is that giving credit to investors for distributions that they rolled over is inequitable because, in a Ponzi scheme, all distributions of "profit" are illusory. The following example illustrates the issue:

▮ Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash. Under the Plan, her starting point for a distribution will be $80,000.

▮ Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash. Her starting point for a distribution under the Plan will be $120,000.

Several of the objectors argue that this result is inequitable, because Investor B is actually out-of-pocket only $100,000, not $120,000. The rolled-over distribution is illusory, they claim, as there were no profits.

These objections ignore two important points, however. First, Investor B could have received the $20,000 distribution, but chose not to—often at the urging of Wextrust employees—and thus that money is properly akin to a loss. Second, and more important, is that ignoring the rolled-over distributions results in an inequity. Using the same examples above:

▮ Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash. Her starting point for the distribution is $80,000, and thus she will receive $8,000. That $8,000, however, is in addition to the $20,000 she has already received, and thus her total recovery from

her gross amount invested is $28,000.

■ Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash. Her starting point for the distribution here will be $120,000, and thus she will receive $12,000. That $12,000, however, is her total recovery. She would have been better off, in the end, if she had received a distribution in cash.

Ignoring the rolled-over amount, as the objectors propose, would further penalize those investors who chose to roll over their investments rather than receive them in cash. Such a result would be inequitable.

Accordingly, the Receiver's proposal to account for rolled-over distributions is approved.

### D. *Deficiency Claims*

■ The Plan proposes that the Court only permit secured creditors to recover out of their collateral, and prohibit them from recovering under the Plan for their deficiency claims. The Receiver argues that, because the secured creditors will receive a greater percentage of their claims than the defrauded investors—due to the fact that secured creditors will be paid ahead of investors—it would be inequitable to permit the secured creditors to recover more. (Plan at 29). I agree, and conclude it is within my equitable authority to do so.

In *Official Comm. of Unsecured Creditors of WorldCom, Inc.*, the Second Circuit affirmed the District Court's approval of a distribution plan that excluded certain creditors from recovery under the plan because of the amount they had already recovered. 467 F.3d at 84.[19] The Court also cited approvingly the following holding of the District Court: "[I]t is fair and reasonable that the limited funds available for distribution not be directed to those who have already recovered more than the approximately thirty-six cents on the dollar recovered by general creditors, and rather be used to increase the still-considerably smaller recovery of those covered by the proposed Distribution Plan." *Id.* at 84.

Similarly, in *Credit Bancorp*, Judge Sweet rejected the argument advanced by a group of investors that their assets were not properly part of the receivership estate on the ground that the defendant did not have an ownership interest in those assets. 2000 WL 1752979, at *17, 2000 U.S. Dist. LEXIS 17171, at *54. "[T]he fact that the [investors] might be entitled under other law to recover their assets does not end the inquiry in this equity receivership because equitable concerns may supersede those other rights." *Id.*

Based on the Second Circuit's decision in *WorldCom*, and the Court's broad equitable authority to "classify claims sensibly in receivership proceedings," *SEC v. Enter. Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009) (Easterbrook, C.J.), I approve the Plan's proposal for treatment of any deficiency claims the secured creditors may have.[20]

---

**19.** The plan in that case was not proposed by a federal receiver, but rather by the SEC pursuant to the "Fair Fund provision" of the Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 308(a), 116 Stat. 745, 784 (2002) (codified at 15 U.S.C. § 7246(a)). The Second Circuit held, however, that the same "fair and reasonable" standard applies to SEC-proposed distribution plans as to receivership

cases, and the court cited receivership cases in its decision. *See id.* at 82–83.

**20.** For the same reasons, I reject the argument advanced by several objectors that I lack the authority to permit the Receiver to treat unsecured creditors the same as defrauded investors, and approve that portion of the Plan.

### E. *Disqualification of Parties Involved in the Fraud*

■ The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw. *See, e.g., SEC v. Basic Energy & Affiliated Res.,* 273 F.3d 657, 660 (6th Cir.2001) (affirming distribution plan that prohibited defendants from recovering at all, and reduced recovery of employees based on level of involvement in fraudulent scheme); *SEC v. Enter. Trust Co.,* No. 08 Civ. 1260, 2008 WL 4534154, at *3, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D.Ill. Oct. 7, 2008) ("Disqualifying those who took the business over the edge is the most common feature, and the least contested aspect, of distribution plans."); *SEC v. Merrill Scott & Assocs.,* No. 02 Civ. 39, 2006 WL 3813320, at **6–7, 2006 U.S. Dist. LEXIS 93248, at **18–19 (D.Utah Dec. 21, 2006) (excluding from distribution party who referred clients to defendant).[21] It is therefore approved.

Any investor whom the Receiver intends to exclude from receiving a distribution shall be notified of the Receiver's decision and the evidence supporting it. The investor will then have an opportunity to respond to the Receiver. If they are unable to resolve any dispute, the Court will decide the issue. *Cf. Credit Bancorp,* 2000 WL 1752979, at *44, 2000 U.S. Dist. LEXIS 17171, at *150 (approving similar procedure).

### F. *Summary Proceedings*

■ It is well-settled that a District Court has the authority, in implementing a distribution plan in a receivership case, to use summary proceedings to evaluate claims and claim priority, provided the parties have an opportunity to be heard to argue their claims. *See Elliott,* 953 F.2d at 1567 (holding that "a district court does not generally abuse its discretion if its summary procedures permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts"); *SEC v. Wencke,* 783 F.2d 829, 837–38 (9th Cir.1986) (rejecting challenge to District Court's use of summary proceedings); *FDIC v. Bernstein,* 786 F.Supp. 170, 177 (E.D.N.Y.1992) ("[O]ne common thread keeps emerging out of the cases involving equity receiverships—that is, a district court has extremely broad discretion in supervising an equity receivership and in determining the appropriate procedures to be used in its administration."). As the Eleventh Circuit recognized in *Elliott,* a summary proceeding is the preferred course of action in a federal receivership because it "reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets." 953 F.2d at 1566.

Accordingly, it is clear that the Court has the authority to approve the processes for claim adjudication described herein, and I hereby exercise my authority to do so.

The timeline the Receiver has proposed is reasonable. It will provide investors and creditors with adequate notice of their recovery, will permit them to discuss the specifics of their claims with the Receiver, and, if the parties cannot resolve the matter, will permit them to make their case before the Court.

Because several of the deadlines have already passed or will soon pass, I hereby extend the deadline, for both investors and

---

21. The Court also has the authority to consider the culpability of any investor seeking to recover under the Plan under the equitable doctrine of unclean hands. *See Credit Bancorp,* 2000 WL 1752979, at *35 n. 48, 2000 U.S. Dist. LEXIS 17171, at *118 n. 48 (noting that "unclean hands" of parties "would be a relevant consideration in equity").

creditors, as follows: To the extent that there are disagreements between the Receiver and the investors or creditors, they have thirty days from entry of this Opinion to resolve them on their own. When thirty days have passed the Receiver shall contact the Court to set a hearing at which the Court will resolve the remaining disputes as promptly as possible.

### G. *Remaining Objections*

The Court has reviewed all the objections submitted regarding the Plan. To the extent the Court has not discussed any specific objection, it is overruled.

### *CONCLUSION*

For the foregoing reasons, the Receiver's Plan is approved, with the exception that the schedule is modified as set forth above.

The Receiver shall post this decision on his website forthwith.

SO ORDERED.