USDC SDNY 
UNITED STATES DISTRICT COURT DOCUMENT 
SOUTHERN DISTRICT OF NEW YORK ELECTRONICALLY FILED 
SECURITIES AND EXCHANGE COMMISSION, DOC 
 DATE FILED: _ 5/18/2021 
 Plaintiff, 
 -against- 19 Civ. 6603 (AT) 
AR CAPITAL, LLC, NICHOLAS S. SCHORSCH ORDER 
and BRIAN 8S. BLOCK, 
 Defendants. 
ANALISA TORRES, District Judge: 
 Before the Court is Plaintiff, the Security and Exchange Commission’s (the “SEC”), motion 
for approval of a proposed plan of distribution of the funds in the fair fund established in this action 
(the “Fair Fund”), ECF No. 41, and Vereit, Inc.’s objections to the proposed plan, ECF No. 45. For 
the reasons stated below, Vereit Inc.’s objections are OVERRULED and the SEC’s motion is 
GRANTED. 
 BACKGROUND! 
 I. Alleged Fraudulent Conduct 
 The SEC brought this action against Defendants AR Capital, LLC (along with its wholly- 
owned subsidiaries, “AR Capital”), Nicholas S. Schorsch, and Brian S. Block. Compl. fff 10-12. AR 
Capital was, at all relevant times, the external manager of the real estate investment trust (“REIT”) 
American Realty Capital Properties, Inc., a Maryland corporation, which was renamed Vereit, Inc. in 

1 Simultaneously to the filing of the complaint, Defendants consented to the Court’s entry of judgment “[w]ithout 
admitting or denying the allegations of the complaint.” ECF Nos. 5 J 2, 6 4 2, 792. Nevertheless, because the Court 
must give some background, and both the SEC and Vereit, Inc., cite to the complaint in their briefing, ECF Nos. 42, 45, 
the Court will rely on the complaint’s recitation of the facts, realizing that Defendants have not conceded any of these 
events occurred. Sec. & Exch. Comm’n v. J.P. Morgan Sec. LLC, No. 12 Civ. 1862, 2017 WL 44209, at *1 (D.D.C. Jan. 
4, 2017). 

2015 (“Vereit”) . Id. ¶ 13. Schorsch was owner of AR Capital and Chairman of Vereit, and Block 
was CFO of Vereit. Id. ¶¶ 11–12. 
 AR Capital’s business consisted of creating and managing REITs, from which it received 
certain fees for activities such as mergers, sales, and public listings. Id. ¶ 16. In late 2012, in 
addition to Vereit, which was publicly traded as of 2011, AR Capital also managed the non-publicly 
traded REITs T3 and T4, of which Schorsch was also CEO and Chairman. Id. ¶¶ 13–15, 17. Each 
REIT was structured as a corporation with an affiliated operating partnership, with the REIT acting as 
the general partner of the operating partnership, pursuant to limited partnership agreements (the 
“LPAs”), and owning a majority of units of the partnership on a 1:1 basis of the outstanding shares of 

the REIT stock. Id. ¶¶ 17–18. 
 Pursuant to the T3 and T4 LPAs, if, upon a liquidity event such as a merger or sale, 
shareholders received a return above six percent, AR Capital would receive 15 percent of the amount 
above six percent as a “promote fee”. Id. ¶ 21. This return would be measured using the fair market 
value of the REITs’ shares on the date of the liquidity event. Id. 
 The SEC alleges that Defendants perpetuated their fraud in connection with the mergers of 
Vereit with T3 and T4. Vereit and T3 entered into a merger agreement on December 14, 2012, and 
announced the merger through various means, including in a form filed with the SEC, on December 
7, 2012, contingent on approval by a majority of Vereit and T3 shareholders. Compl. ¶¶ 25, 29, 30. 
On January 22, 2013, Vereit and T3 filed a joint proxy statement with the SEC. On February 26, 

2013, a majority of shareholders approved the transaction, and the merger closed on February 28, 
2013. Id. ¶¶ 30, 34. Four months later, on July 1, 2013, Vereit and T4 entered into a merger 
agreement that was, in relevant respects, identical to the agreement between Vereit and T3, and was 
also contingent on shareholder approval. Id. ¶¶ 63, 68. The merger was announced on July 2, 2013, 

2 To avoid confusion, the Court refers to the entity as Vereit at all time periods, including before its name change. 
including through forms filed with the SEC, and T4 and Vereit issued proxy statements on December 
4, 2013. Id. ¶¶ 67–68. The merger closed on January 3, 2014. Id. ¶ 74. 
 In each of these mergers, AR Capital was to take its promote fee in units of the T3 or T4 
partnership, based on a formula determined by the fair market value that determined the shareholders’ 
return. Id. ¶ 22. These units, in turn, would be converted to units of the Vereit partnership in the 
merger. Id. 
 However, contrary to the disclosures to the shareholders, and the merger agreements approved 
by the shareholders, Defendants changed the method of calculating the return to investors from which 
the promote fee was calculated, resulting in AR Capital receiving approximately three million more 

units of Vereit’s partnership than it was entitled, valued at $31,972,934. Compl. ¶¶ 35–55, 72–78; 
ECF No. 51-2 ¶ 7. Defendants, in disclosures and annual reports, misrepresented to the SEC that 
they were entitled to these shares. Compl. ¶¶ 58–60, 77–79. 
 In addition, in connection with the mergers, Defendants caused Vereit and AR Capital to 
execute asset purchase and sale agreements, pursuant to which Vereit would purchase from AR 
Capital certain furniture, fixtures, and equipment “necessary for the T3- and T4-related post-merger 
operations of [Vereit],” for $5.8 million per agreement—a price that did not reflect the actual value of 
the items being transferred. Id. ¶¶ 82–83. These agreements were exhibits to the disclosures 
announcing the mergers. Id. ¶¶ 85, 88. 
 II. Events Subsequent to the Alleged Fraud 

 On October 29, 2014, Vereit announced that reports and other documents for the fiscal year 
ending in December 31, 2013, and for the first and second quarters of the fiscal year 2014, should no 
longer be relied on, based on fraud unrelated to the conduct at issue here. October 29, 2014 Form 
8-K, ECF No. 45-2 at 3. Vereit’s shares dropped following this announcement, for a market 
capitalization loss of over $2 billion. SEC Mem. at 6, ECF No. 42. In December 2014, Vereit 
announced that Schorsch was resigning and Vereit would be unwinding its relationships with all 
entities affiliated with Schorsch, causing a further drop in share price. SEC Mem. at 6. 
 Beginning in 2015, Vereit shareholders brought a number of class action and derivative suits, 
all of which settled by January 22, 2020, in agreements encompassing shareholders, Vereit, and 
Defendants. In re American Realty Capital Properties, Inc. Litigation, No. 15 Misc. 40 (S.D.N.Y. 
Jan. 23, 2020), ECF No. 1312; Witchko v. Schorsch, No. 15 Civ. 6043 (S.D.N.Y. Jan. 22, 2020), ECF 
No. 309. 
 The SEC brought claims against Defendants on July 16, 2019, alleging violations of § 17(a) of 
the Securities Act of 1933 (the “Securities Act”), 15 U.S.C. § 77q(a), § 10(b) of the Securities 

Exchange Act of 1934 (the “Exchange Act”), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated 
thereunder, 17 C.F.R. § 240.10b-5, and § 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated 
thereunder, 17 C.F.R. § 240.13b2-1. Compl. ¶¶ 97–111. On the same day, the SEC filed the 
consents of Defendants to proposed final judgments, ECF Nos. 5–7, 10, which the Court entered. 
ECF Nos. 8–9, 11. 
 The judgments rendered Defendants liable for cash disgorgement and civil penalties, which 
have all now been paid to the Fair Fund held by the SEC. ECF Nos. 8–9, 11; SEC Mem. at 4. In 
total, the Fund holds $34,063,856, of which $12,313,856 is disgorgement and prejudgment interest, 
and $21,750,000 is civil penalties. SEC Mem. at 3–4. 
 In addition, the AR Capital judgment required AR Capital to disgorge 2,922,445 of Vereit’s 

partnership units to Vereit, which Vereit then cancelled. ECF No. 9 at 4; SEC Mem. at 3 n.2. 
Pursuant to the settlement agreement in the derivative and class actions, Vereit agreed to offset 
Defendants’ payment to the settlement fund with the value of those units. ECF Nos. 51-2 ¶ 1, 
51-3 ¶ 1. 
 III. The Distribution Plan 
 The consent judgments permit the SEC to propose a plan for distribution of these funds 
subject to the Court’s approval. ECF Nos. 8 at 5, 9 at 6, 11 at 6. On September 14, 2020, the SEC 
filed its motion for the Court to approve its distribution plan (the “Plan”). ECF No. 41. 
 The SEC’s plan, made in discussion with the Court-appointed distribution agent, proposes to 
distribute the funds on a pro rata basis to those investors who purchased or acquired shares of Vereit 
common stock between February 28, 2013 (the closing date of the T3 merger) and October 28, 2014, 
and held the shares through the close of trading on October 28, 2014. Plan ¶ 52, ECF No. 42-1. 
 On October 13, 2020, Vereit filed objections to the Plan. 

 DISCUSSION 
 I. Legal Standard 
 A Court reviews the SEC’s proposed distribution plan to determine whether it is “is fair and 
reasonable.” SEC v. Wang, 944 F.2d 80, 83–85 (2d Cir. 1991) (“[O]nce the district court satisfies 
itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its 
review is at an end.” (alterations omitted)); see also SEC v. Byers, 637 F. Supp. 2d 166, 174 
(S.D.N.Y. 2009). “In making its decision, a court may defer to the receiver’s choices for the plan’s 
details and should give substantial weight to the SEC’s views regarding a plan’s merits.” SEC v. 
Amerindo Inv. Advisors Inc., No. 05 Civ. 5231, 2017 WL 3017504, at *2 (S.D.N.Y. July 14, 2017) 
(alteration and citation omitted); see also Byers, 637 F. Supp. at 175 (“The SEC’s judgment is entitled 

to deference from this Court.”). 
 II. Objections 
 Vereit makes two overarching objections to the Plan: first, that Vereit should receive the 
disgorged funds (the “Funds”), not Vereit’s shareholders, and second, that the Plan itself is not fair 
and reasonable to the shareholders.3 
 A. Vereit and the Disgorged Funds 
 Vereit objects that it should receive the Funds because, in effect, it is the true victim of 
Defendants’ actions. Vereit Mem. at 15–20. Initially, Vereit argues that the Supreme Court’s 
decision in United States v. Liu, 140 S. Ct. 1936 (2020), requires the Court to “confine any award of 
disgorgement to traditional equitable remedies.” Vereit Mem. at 14. Therefore, Vereit argues, 

because it would be the recipient of the Funds “[u]nder any equitable doctrine that could possibly be 
invoked here,” Vereit must receive the Funds. Id. at 15. 
 The Court does not read Liu so broadly. In Liu, the Supreme Court held that disgorgement 
was a permissible remedy under 15 U.S.C. § 78u(d)(5). 140 S. Ct. at 1940. It reasoned that because 
disgorgement was a permissible remedy in traditional equity courts, it was also available to the SEC. 
Id. at 1942–45. In addition, because “courts have occasionally awarded disgorgement in three main 
ways that test the bounds of equity practice: by ordering the proceeds of fraud to be deposited in 
Treasury funds instead of disbursing them to victims, imposing joint-and-several disgorgement 
liability, and declining to deduct even legitimate expenses from the receipts of fraud,” the Court ruled 
those practices impermissible. Id. at 1946–48. It did not, however, further limit the disgorgement 

remedy. See SEC v. Cope, No. 14 Civ. 7575, 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021) 
(“The Court . . . set forth several principles to guide the lower courts in developing appropriate 
disgorgement orders in SEC enforcement actions . . . .” (quotation marks, alterations, and citations 

3 Vereit objects only to the portion of the Fair Fund which constitutes disgorged funds, and takes no position on the 
disposition of the civil penalties. Vereit Mem. at 4, ECF No. 45. 
omitted)). As long as the Plan returns the Funds to “victims,” therefore, it does not run afoul of Liu. 
Id. (“While Liu limited to a certain extent the scope of the disgorgement remedy, a district court 
retains broad equitable power to fashion appropriate remedies for federal securities law violations.” 
(quotation marks and citation omitted)). 
 The Court concludes that Vereit’s shareholders are independent victims of Defendants’ 
scheme. The complaint filed in this action contemplates that the Defendants made misrepresentations 
directly to shareholders, to whom Defendants owed an independent fiduciary duty. Compl. ¶¶ 3, 
22–23, 30–33, 35, 42, 53, 61, 68–70, 72; see Strougo v. Bassini, 282 F.3d 162, 173 (2d Cir. 2002). 
The SEC and the distribution agent determined that investors were harmed by Defendants’ fraud. 

SEC Mem. at 10; Byers, 637 F. Supp. 2d at 175. Moreover, the doctrine of piercing the corporate veil 
does not foreclose the SEC from considering shareholders of an extant company as victims and so 
distributing funds directly to them. See, e.g., SEC v. Brant, No. 7 Civ. 1075 (S.D.N.Y.), ECF Nos. 1 
at 9–13, 29, 36 (approving a distribution plan to a company’s shareholders where the CEO of the 
company had a judgment entered against him for, inter alia, claims of Securities Act § 17(a), 
Exchange Act § 10(b) and Rule 10b-5, and Exchange Act 13(b) violations). Therefore, Vereit’s 
shareholders are reasonably considered victims under Liu. 
 In addition, the SEC’s choice to disburse the Funds to investors rather than Vereit is fair and 
reasonable. The cases cited by Vereit, although establishing that the SEC may disburse the Funds 
directly back to the company of a defendant, do not establish that the SEC must disburse the Funds 

back to the company. Vereit Mem. at 15–16; compare SEC v. Gupta, No. 10 Civ. 100 (D. Neb. Mar. 
9, 2010), ECF No. 9 at 6 (reimbursing defendant’s company as agreed upon in a consent judgment) 
with Brant, No. 7 Civ. 1075, ECF No. 29; S.E.C. v. Drexel Burnham Lambert, Inc., 956 F. Supp. 503, 
506 (S.D.N.Y. 1997) (“[I]t is the policy of the SEC whenever possible to recommend a distribution 
plan by which a defendant’s unlawful gains are paid out to defrauded investors”), aff’d sub nom. 
S.E.C. v. Fischbach Corp., 133 F.3d 170 (2d Cir. 1997). 
 Vereit argues that, because it can trace the Funds to the money misappropriated from it 
through the asset purchase and sale agreements, it is entitled to them. Vereit Mem. at 15–17. 
However, “[t]racing analysis . . . has been almost universally rejected by courts as inequitable.” 
Byers, 637 F. Supp. 2d at 177; see also Credit Bancorp, Ltd., 2000 WL 1752979 at *14 (“[W]hile a 
court sitting in equity may allow tracing, there is no entitlement on the part of a defrauded customer 
to that measure.”). When tracing is applied, “the difference between those who get more and those 
who get less is a ‘fortuity,’” based on the timing of whose funds happened to be used when. S.E.C. v. 

Enter. Tr. Co., No. 08 Civ. 1260, 2008 WL 4534154, at *4 (N.D. Ill. Oct. 7, 2008), aff’d, 559 F.3d 
649 (7th Cir. 2009) (quoting Credit Bancorp, Ltd., 2000 WL 1752979, at *15–16). Therefore, “[i]n 
equity, remedies to which claimants might be entitled to under other law may be suspended if such a 
measure is consistent with treating all claimants fairly.” Credit Bancorp, Ltd., 2000 WL 1752979, at 
*28, see also id. at *15 (“To allow any individual to elevate his position over that of other investors 
similarly ‘victimized’ by asserting claims for restitution and/or reclamation of specific assets based 
upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable 
results, in that certain investors would recoup 100% of their investment while others would receive 
substantially less.” (alteration and citation omitted)). 
 Here, Vereit has already received a value of $31,972,934 in the disgorgement of Vereit 

partnership units, nearly 70 percent of what it claims. SEC Reply at 19, ECF No. 50. By contrast, 
some of the investors would not receive any reimbursement if not for the Fund, particularly those 
who have now sold their stock in Vereit. See S.E.C. v. Worldcom, Inc., No. 02 Civ. 4963, 2004 WL 
1621185, at *2 (S.D.N.Y. July 20, 2004) (“[I]t is fair and reasonable that the limited funds available 
for distribution not be directed to those who have already recovered more than the approximately 36 
cents on the dollar recovered by general creditors, and rather be used to increase the still-considerably 
smaller recovery of those covered by the proposed Distribution Plan.”), aff’d sub nom. Official 
Comm. of Unsecured Creditors of WorldCom, Inc., 467 F.3d 73 (2d Cir. 2006). Were Vereit to 
receive the Funds, that would be inconsistent with the principle that “similarly-situated investors [be] 
treated alike.” Credit Bancorp, Ltd., 2000 WL 1752979, at *28. Those investors who sold their 
Vereit shares sometime after October 28, 2014, would receive nothing, and those who retained their 
shares would receive more through Vereit. Drexel Burnham Lambert, Inc., 956 F. Supp. at 507–08 
(concluding it would not be fair and reasonable to distribute funds to the company from which the 
defendant took money, when it had since been acquired by a different company and to award funds to 

the acquiree would be a windfall and “do nothing to compensate those persons directly damaged” by 
the defendants’ action). Moreover, Vereit, in its position as shareholder defrauded by Defendants, 
would also be treated differently by receiving the entirety of the Funds. In addition, although Vereit 
had the option of suing Defendants directly, it decided not to do so, thus harming its equitable 
position. Witchko v. Schorsch, No. 15 Civ. 6043, 2016 WL 3887289, at *2 (S.D.N.Y. June 9, 2016). 
 Therefore, the Court concludes it was fair and reasonable of the SEC to determine that the 
investors were the proper recipients of the Funds. See SEC v. CR Intrinsic Investors, LLC, 164 F. 
Supp. 3d 433, 435 (S.D.N.Y. 2016) (“[N]early every plan to distribute funds obtained in an [SEC] 
enforcement action requires choices to be made regarding the allocation of funds between and among 
potential claimants within the parameters of the amounts recovered.” (quotation marks omitted)); 

Wang, 944 F.2d at 85 (“This kind of line-drawing—which inevitably leaves out some potential 
claimants—is, unless commanded otherwise by the terms of a consent decree, appropriately left to the 
experience and expertise of the SEC in the first instance.”). 
 B. The Plan’s Fairness and Reasonableness 
 Vereit also objects to (1) the dates used to define the class of investors receiving the Funds, 
and (2) the method of distribution. Vereit Mem. at 21–23. The Court, however, concludes the SEC’s 
composition and distribution method are reasonable. 
 First, Vereit asserts that the SEC chose its definition of the recipients of the Funds (those who 
purchased Vereit shares between February 28, 2013, to October 28, 2014) simply because the dates 
corresponded to the unrelated class action brought against Vereit. Vereit Mem. at 21. Vereit argues 
that (1) this definition excludes individuals who had purchased shares before February 28, 2013, but 
held them on that date, id. at 21, and (2) the end date, which corresponds to disclosures that unrelated 

fraud had occurred, has nothing to do with the wrongdoing alleged in this action, id. at 22–23. 
However, the SEC offers a sound rationale for these dates: it opted for a definition beginning with 
those who purchased shares after February 28, 2013—the date of the closing of the T3 merger—
because investors who bought shares before February 28, 2013, could not bring a securities fraud 
claim against Vereit; it chose October 28, 2014, as an end date because it was the first announcement 
of fraud, though mostly unrelated, and the precipitous stock price drop. SEC Reply at 12–14. 
 “Determining a cutoff date is quintessential ‘line-drawing’ appropriately left to the discretion 
of the [SEC].” Sec. & Exch. Comm’n v. J.P. Morgan Sec. LLC, 266 F. Supp. 3d 225, 232 (D.D.C. 
2017) (quoting Wang, 944 F.2d at 88). Moreover, these dates are reasonable: courts have held both 
beginning when the investors would be able to bring suit against Vereit, and ending when the fraud 

began to have less effect, to be reasonable. Id. at 233 (“[T]he point is not to measure when precisely 
the full details of Defendants’ conduct was revealed, but to ascertain a reasonable point in time when 
non-disclosures had significantly less effect on new investment decisions.”); Worldcom, Inc., 2004 
WL 1621185, at *2 (“[I]t can hardly be unfair to exclude a group that, under existing securities law, 
could not even bring a securities fraud claim directly against [the issuer].”). 
 Second, Vereit objects that the Plan distributes the Funds on a purely pro rata basis, rather 
than taking into account the different amounts appropriated over time. Vereit Mem. at 22. Courts 
approve pro rata distribution where investors’ funds have been commingled, and the victims are 
“similarly situated with respect to their relationship to the defrauders.” Byers, 637 F. Supp. 2d at 177 
(quotation marks and citation omitted). Here, the Funds, gained indirectly through investments, were 
commingled. Moreover, the investors, though not identically situated due to their acquiring the funds 
at different times, have enough of a “reasonably close resemblance of facts and circumstances” to be 
considered similarly situated. Jd. at 180 (quoting Lizardo v. Denny’s, Inc., 270 F.3d 94, 101 (2d Cir. 
2001)). Therefore, pro rata distribution is reasonable here. See also id. at 177 (cautioning against 
“rewarding certain investors over others based on arbitrary factors.”). 
 Accordingly, the Court concludes that the Plan is fair and reasonable. 
 CONCLUSION 
 For the reasons stated above, Vereit’s objections are OVERRULED. The SEC’s motion to 
approve the Plan is GRANTED, and the Court approves in its entirety the Distribution Plan attached 
hereto. The Distribution Plan shall govern the administration and distribution of the Fair Fund 
previously established by Order entered October 22, 2019. 
 SO ORDERED. 
Dated: May 18, 2021 
 New York, New York 
 OA 
 ANALISA TORRES) 
 United States District Judge 

 11 

UNITEDSTATES DISTRICT COURT 
SOUTHERNDISTRICT OFNEWYORK 

SECURITIES ANDEXCHANGE COMMISSION, 19Civ.6603(AT) 
 Plaintiff, 
 --against-- 
ARCAPITAL,LLC,NICHOLAS S.SCHORSCH 
and BRIANS.BLOCK, 
 Defendants. 

 DISTRIBUTIONPLAN 
I. Introduction 
1. The Securities and Exchange Commission submits this proposed plan of distribution for the
 distribution of funds paidin the above captioned action to compensate shareholders harmed
 byDefendantsviolationsofthefederalsecuritieslawsbymakingmaterialmisstatementsand
 omissions and engaging in other improper conduct in connection with two mergers in 2013
 and 2014 involving American Realty Capital Properties, Inc. (“ARCP”) (now known as
 VEREIT, Inc.)andimproperlyobtainedmillions ofdollars from theirviolations.
2. On July 16, 2019, the SEC filed a Complaint against AR Capital, LLC, (“AR Capital”),
 Nicholas S. Schorsch (“Schorsch”), and Brian S. Block (“Block” and collectively, with AR
 Capital and Schorsch, the “Defendants”) (the “SEC Complaint”). As alleged in the
 Complaint,ARCapital sponsoredandexternallymanagedREITs,includingARCP andtwo
 publicly held, non-traded REITs: American Realty Capital Trust III, Inc. (“T3”) and
 American Realty Capital Trust IV, Inc. (“T4”). ARCP completed a merger with T3 in
 February2013(the“T3 Merger”),and withT4inJanuary2014(the“T4 Merger”). 
3. TheComplaintfurtherallegedthatcontrarytoshareholderdisclosures,DefendantARCapital,
 acting through Block and Schorsch, inflated several aspects of an incentive fees “that
 enrichedtheDefendants attheexpenseoftheREITsandtheirshareholders,”whichresulted
 inDefendants’collectingatotalof2,922,445ARCPoperatingpartnershipunits(“OPunits”)
 to which they were not entitled and that Defendants made additional related misstatements
 in subsequent ARCP public filings with the Commission, including in quarterly and annual
 reports onForms 10-Kand10-Q. 
4. The SEC Complaint also alleged that Defendants’ misleading presentation of agreements—
 purportedlyforpurchasingfurniture,fixtures,andequipmentnecessaryfortherespectiveT3
 orT4-relatedpost-mergeroperationsandreimbursingARCapitalforcertain“unreimbursed
 expenses”—inpublicfilingswiththeSEC,resultedintheDefendantswrongfullyobtaining
 at least $7.27 million in unsupported compensation. The SEC complaint alleged the
 Defendants’ actions relating to these agreements also resulted in recording false entries on
 VEREIT’s books andrecords. 
5. Without admitting or denying the allegations in the SEC Complaint, the Defendants
 consented to the entry of final judgments against them. AR Capital was ordered liable for
 disgorgement, “representingprofits gained as a result of conduct alleged in the Complaint,”
 of2,922,445OPunitsand$11,275,065plusprejudgmentinterestthereonof$1,038,791.The
 SchorschandBlockfinaljudgmentsorderedeachliableonajoint-and-severalbasiswithAR
 Capital for certain amounts of the disgorgement. The final judgments also ordered payment
 of civil penalties of $14,000,000 against AR Capital, $7,000,000 against Schorsch, and
 $750,000 against Block. (DE 8, 9, 11.) The Final Judgments required the Defendants to
 satisfythe disgorgement obligation with respect to the OP units bythe surrender and return
 of such OP units to ARCP for cancellation and by the payment of cash disgorgement,
 prejudgment interest, and civil penalties to the SEC. In July2019, Defendants paid the cash
 disgorgement, prejudgment interest, and penalties to the Commission and surrendered the
 OP units as requiredbythejudgments. 
6. The cash disgorgement, prejudgment interest, and penalties paid to the Commission is
 currently invested at the Bureau of the Fiscal Service (“BFS”) at the United States
 Department oftheTreasury. Anyinvestment fees oftheBFS will bepaid bythe Fair Fund.
7. ByOrder dated October 22, 2019, the Court created a Fair Fund pursuant to Section 308(a)
 of Sarbanes-Oxley, as amended, and appointed Miller Kaplan Arase LLP (“MKA”) as Tax
 Administrator to execute all income tax reporting requirements, including the preparation
 and filing of tax returns for all funds under the Court’s jurisdiction in this case. By Order
 dated April 16, 2020, the Court appointed Kurtzman Carson Consultants, LLC (“KCC” or
 “Distribution Agent”) to serve as the Distribution Agent to oversee the administration and
 distribution of the Fair Fund, in coordination with the Commission staff, and in accordance
 withtheterms ofadistributionplantobeapprovedbytheCourt. 
8. ThisDistributionPlanwasdevelopedjointlybytheDistributionAgentandtheCommission
 staff in accordance with practices and procedures customary in Commission Fair Fund
 distributions. This Distribution Plan governs the administration and distribution of the Fair
 Fund,andsetsforththemethodandproceduresfordistributingtheassetsoftheFairFundto
 certainARCP investors harmedbythemisconduct. 
9. Separately, on January 22, 2020, a settlement was approved in the action In re American
 Realty Capital Properties, Inc. Litigation, Civil Action No. 1:15-mc-00040-AKH in the
 UnitedStates District Court,SouthernDistrict of NewYork (the “Class Action”). ByOrder
 datedOctober4,2019,Gilardi&Co.LLC1wasappointedClaimsAdministratorintheClass
1KCCLLCacquiredclassactionclaimsadministratorGilardi&Co.LLCinAugust2015. 
 SECv.ARCapitalLLC,et.al,
 Action.InaneffortreducetheburdentoClassActionClaimants,whilealsostreamliningthe
 administration, reducing costs and maximizing the amount of the Fair Fund available for
 distribution the Distribution Agent will leverage the data from claims filed in the Class
 Action.Furtherdetails areprovidedbelow. 
II. Definitions 
10. As usedinthis DistributionPlan,thefollowingdefinitions shall apply: 
 a. “Check-cashing Period” means the ninety (90) days following the mailing of
 Distribution Payment checks to Eligible Claimants in accordance with this
 DistributionPlan. 
 b. “Claim Form” means the form designed by the Distribution Agent for the filing of
 claims in accordance with the terms of this Distribution Plan. The Claim Form will
 require, at a minimum, sufficient documentation reflecting anyPotential Claimant’s
 acquisitions anddispositions oftheEligibleSecurityduringtheRelevant Period.
 c. “Claimant” means a Class Action Claimant or a Potential Claimant who files a
 Claim Form inthis actionbytheClaims FilingDeadline. 
 d. “Claims Filing Deadline” means the date established in accordance with this
 DistributionPlanbywhichaPotentialClaimant’sClaimFormmustbefiledtoavoid
 the denial of any right of the Potentially Eligible Claimant to participate in any
 distribution from the Net Available Fair Fund. The Claims Filing Deadline shall be
 onehundredandtwenty(120)days afterthe Initial Mailing. 
 e. “Class Action” or “Class Action Settlement” means the settlement reached in
 connection with the In re American Realty Capital Properties, Inc., Litigation, Civil
 Action No. 1:15-mc-00040-AKH before the United States District Court for the
 SouthernDistrict ofNew York. 
 f. “Class Action Claimants” means investors that filed claims in the Class Action
 administration. 
 g. “Days”means calendardays,unless otherwisespecifiedherein. 
 h. “De Minimis Amount” means the minimum preliminary calculation amount of
 $10.00. No Eligible Claimant shall receive a distribution payment unless the
 preliminarycalculationis equal toor greaterthan $10.00. 
 i. “Determination Notice” meanstheNoticesent toClaimantsindicatingthestatus of
 theclaim,whethereligibleorrejectedinwholeorinpart,andprovidinginformation
 as described furtherbelowinthesectiontitled“Claims DeterminationProcesses.”
 j. “Distribution Agent” refers to KCC (collectively with all employees, agents,
 consultants, or independent contractors of such firm), which has been appointed by
 the Court to administer and distribute the Fair Fund in accordance with the terms of
 this DistributionPlanandtheCourt’s orders. 
 k. “Distribution Payment” means the payment to an Eligible Claimant in accordance
 with the Plan. The Distribution Payment for an Eligible Claimant will be calculated
 inaproratafashioninaccordancewiththePlan ofAllocation. 
 l. “Distribution Plan” or the “Plan” means this Distribution Plan in the form
 approvedbytheCourt. 
 SECv.ARCapitalLLC,et.al,
m. “EligibleClaimant”meansaClaimantwhopurchasedorotherwiseacquiredARCP
 common stock on or after February 28, 2013, including in the T3 Merger, and held
 that stockat thecloseoftradingOctober28,2014, except forExcludedParties.
n. “Eligible Security” means common stock of American Realty Capital Properties,
 Inc.,tradedundertheticker“ARCP”onNASDAQ’sGlobalSelectMarketpurchased
 orotherwiseacquiredduringtheRelevant Period. 
o. “Eligible Share” means one (1) share of an Eligible Securityheld through the close
 of trading on October 28, 2014. In the plural, Eligible Shares means two (2) or a
 highernumberofEligibleSecuritiesheldthroughthecloseoftradingonOctober28,
 2014. 
p. “Excluded Parties” shall mean the Defendants to this action, the Defendants to the
 Class Action, American Realty Capital Properties, Inc., American Realty Capital
 Trust III, Inc. and American Realty Capital Trust IV, Inc., and any parents,
 subsidiaries, directors, members, partners, and employees, and any assigns, heirs,
 spouses, parents, dependents or controlled entity(ies) of the foregoing; and the
 DistributionAgent,itsemployees,andthosepersonsassistingtheDistributionAgent
 inits roleas DistributionAgent. 
q. “Fair Fund” refers to the $34,063,856 fund created by the Court pursuant to the
 provisionsofSarbanes-Oxley,asamended,andpursuanttothefinaljudgments,plus
 any accumulated interest or earnings thereon or any additions thereto as may be
 providedbyfutureCourt orderor agreement inrelatedcases orotherwise.
r. “Fair Fund Notice”means awrittennoticefrom theDistributionAgent toPotential
 Claimants informing them of the Fair Fund and its eligibility requirements, and
 explaining how to submit a claim. The notice will be both mailed and posted to the
 websiteaccordingtothe scheduledetailedherein. 
s. “Initial Mailing” means, per the terms of the Plan and as further described below,
 the mailing of the Postcard Notice to Class Action Claimants and the Notice Packet
 to Potential Claimants, collectively. The Initial Mailing is to take place within sixty
 (60) days following the entry by this Court of an Order approving this Distribution
 Plan. 
t. “NetAvailableFairFund”meanstheFairFund,lessanyamountsexpendedfortax
 obligations,fees andexpenses ofthe DistributionAgent andTax Administrator,and
 thefees oftheBureauof Fiscal Services inaccordancewiththis DistributionPlan.
u. “Notice of Publication” means the publication of the Fair Fund Notice, or a notice
 closelyresembling the Fair Fund Notice, in print, PR Newswire or internet media in
 a manner deemed appropriate bythe Distribution Agent and not unacceptable to the
 Commission staff. Such notice (the text of which shall be approved by the
 Commissionstaff)shallinclude,ataminimum,astatementthattheFairFundrelates
 to shares of ARCP common stock purchased or otherwise acquired during the
 Relevant Period and held at the close of trading October 28, 2014, and the means of
 obtainingaNoticePacket. 
v. “Notice Packet” means the materials relevant to submitting a claim that may be
 provided to Potential Claimants known to the Distribution Agent or to those who
 obtain such materials through a website or other appropriate delivery mechanisms.
 SECv.ARCapitalLLC,et.al,
 These materials will include a copy of the Fair Fund Notice and a Claim Form
 (togetherwithinstructions forcompletionoftheClaim Form). 
 w. “Person”meansnaturalindividualsaswellaslegalentitiesincluding,butnotlimited
 to,corporations,partnerships,limitedliabilitycompanies,andgovernmentalentities.
 x. “Plan of Allocation” means the methodologyby which a Claimant’s Eligible Share
 Amountiscalculated.ThePlanofAllocationissetforthinAppendix1andattached
 hereto. 
 y. “Postcard Notice” means the written notice sent to Class Action Claimants
 informing them of the Fair Fund and the fact that the data already submitted in
 connection with the Class Action will be used to determine the Class Action
 Claimant’s eligibilityfor theFair Fund. 
 z. “Potential Claimant”means anindividual orentity,ortheirlawful successors,who
 purchased or acquiredARCP commonstockduringthe Relevant Period,but is not a
 Class ActionClaimant. 
 aa. “Relevant Period” means February 28, 2013, through and including October 28,
 2014. 
 bb.“Request for Reconsideration Deadline” shall mean the date established in
 accordance with this Plan by which a Claimant’s request to reconsider a
 Determination Notice must be filed to challenge the Determination Notice. Subject
 tocertainextensionsprovidedforinthisPlan,thedeadlinetofilesuchrequestsshall
 betwenty(20)days from thedateofDetermination Notice. 
 cc. “Tax Administrator” means Miller Kaplan and Arase LLP, formerly known as
 Damasco & Associates LLP, the firm appointed by the Court on October 22, 2019,
 as theTax Administratorinthis action. 
 dd.“Third-Party Filer” means a third-party, including without limitation a nominee,
 custodian, or an intermediary holding in street name, who is authorized to, and
 submits, a claim(s) on behalf of one or more potentially eligible Claimants. Third-
 Party Filer does not include assignees or purchasers of claims, which are excluded
 from receivingdistributionpayments. 
III. Administration of theFairFund 
 A. Identification of and Noticeto Potential Claimants and Class Action Claimants
11.UponapprovalbytheCommissionstaff,KCCwillcompileinformationforallClassAction
 Claimants, includingthe name, address, and ARCP common stock transactions and holding
 informationfiledintheClass Action. 
12.TheDistributionAgentwilldesignandsubmitaPostcardNoticetotheCommissionstafffor
 reviewand approval. 
13.TheDistributionAgentwilldesignandsubmitaNoticePacket,includingaFairFundNotice
 andaClaim Form,tothe Commissionstaffforreviewand approval. 
 SECv.ARCapitalLLC,et.al,
14. The Distribution Agent will create a mailing database consisting of the records of all Class
 ActionClaimants,ofallknownopt-outsfromtheClassAction,andofPersonsthatacquired
 shares viatheT3merger providedbyCommissionstaff. 
15. Before commencing any mailing, the Distribution Agent will run a National Change of
 Address search to obtain updated addresses for all Class Action Claimants and Potential
 Claimants recordedin thedatabase. 
16. The Distribution Agent will mail Notice Packets to Persons that acquired shares via the T3
 merger and to other known Potential Claimants, including known Persons that opted out of
 theClass Action,andwill mail Postcard Notices toClass ActionClaimants.
17.TheDistributionAgent will commencemailingthe Notice Packet to all Potential Claimants
 known to the Distribution Agent and will mail a Postcard Notice to all Class Action
 Claimants2 within sixty days (60) days following the entry by this Court of an Order
 approving this Distribution Plan (the “Initial Mailing”). Each Notice Packet will notify the
 Potential Claimant of the Fair Fund, contain a brief description of the eligibility
 requirements, generally describe the Fair Fund’s claim and distribution processes, explain
 how to obtain a copyof the approved Distribution Plan and Claim Form byrequest or from
 the Fair Fund website, and provide instructions for submittinga claim. The Postcard Notice
 willnotifyClassActionClaimantsthattheydonotneedtofilenewclaimsfortheFairFund,
 butwillhavetheirClassActionclaimscarriedoverandre-evaluatedbasedontheFairFund
 PlanofAllocation. 
18. Notice Packets will be available on the Fair Fund website to view and download.
 Additionally, the Distribution Agent shall continue to supply the Notice Packet to Persons
 whocontact theDistributionAgent requestinga copyviamail,phoneore-mail.
19. Within ten (10) days of the Initial Mailing, the Distribution Agent will carry out the Notice
 of Publication, which will notify the public of the Fair Fund, contain a brief description of
 the eligibility requirements, generally describe the Fair Fund’s claim and distribution
 processes,explainhowtoobtainacopyoftheapprovedDistributionPlanandNoticePacket
 byrequest orfrom theFairFundwebsite, andprovideinstructions forsubmittingaclaim.
20.TheDistributionAgentwillestablishandmaintainawebsitedevotedsolelytotheFairFund.
 TheFairFundwebsite,locatedatwww.ARCapitalFairFund.com,willmakeavailableacopy
 oftheNoticePacket,theapprovedDistributionPlan,andothercourtdocuments.Further,the
 website will provide information regarding the claims process and eligibility requirements
 for participation in the Fair Fund, and such other information coveringprocess or substance
 that the Distribution Agent believes will be beneficial to Class Action Claimants and
 Potential Claimants. The Commission staff retains the right to review and approve any
 material postedonthe FairFundwebsite. 
2ForClassActionClaimsthatwerefiledelectronicallybyanominee,brokerorThird-PartyFiler,the
PostcardNoticewillbetransmittedviaemailtothenominee,brokerorThird-PartyFiler.
 SECv.ARCapitalLLC,et.al,
21.TheDistributionAgent will provideacopyof theDistributionPlanandFairFundNoticeto
 thestaffoftheCommissionwhowillposttheDistributionPlanandFairFundNoticeonthe
 InformationforHarmedInvestorspageofwww.sec.govandestablishalinktotheFairFund
 website. 
22. The Distribution Agent will establish and maintain a toll-free telephone number for
 ClaimantstocalltospeaktoaliverepresentativeoftheDistributionAgentduringitsregular
 business hours, 8:00 a.m. to 8:00 p.m., Eastern Standard Time, or, outside of such hours, to
 hear prerecorded information about the Fair Fund. The Distribution Agent will advise the
 Commission staff of the toll-free telephone number. The Distribution Agent will also
 establishandmaintainatraditionalmailingaddressandanemailaddresstoenableClaimants
 tocorrespondwiththeDistributionAgent. 
23. The Distribution Agent will attempt to locate any Potential Claimant whose mailing is
 returned bythe United States Postal Service (“USPS”) as “undeliverable.” The Distribution
 Agentwillutilizeallmeansreasonablyavailable,toobtainupdatedaddressesinresponseto
 undeliverable notices, and forward any returned mail for which an updated address is
 provided or obtained. Additional efforts to identify new addresses for returned undelivered
 mailwillbeconductedasnecessaryandeconomicallyreasonableafterconsultationwiththe
 Commission staff. 
 B. Claims Process 
24.TheClaimsFilingDeadlinewillbeclearlyidentifiedinallmaterialsasthefirstbusinessdate
 following the calendar date 120 days from the Initial Mailing. To avoid being barred from
 asserting a claim, each Potential Claimant must submit to the Distribution Agent a properly
 completedClaimFormreflectingsuchPotentialClaimant’sclaim,togetherwithallrequired
 supporting documentation postmarked on or before the Claims Filing Deadline. A Claim
 Form that is postmarked after the Claims Filing Deadline will be marked as “late” and only
 accepted, if after consulting with the Commission staff, the processing of these claims will
 not delay the distribution process. Any extension of the Claims Filing Deadline will be
 published on the Fair Fund website. A Claim Form is to be deemed to be submitted when
 postmarked, if received with a postmark indicated on the envelope and if mailed by first-
 class mail and addressed in accordance with the instructions thereon. In all other cases, the
 Claim Form shall be deemed to have been submitted on the date when actually received by
 theDistributionAgent. 
25.TheDistributionAgentwill,within60daysofreceipt,acknowledgeviapostcardthereceipt
 ofClaim Forms filedbyPotential Claimants bymail.Aclaim is not deemedtobeofficially
 filed unless the Potential Claimant receives such a postcard (the “Acknowledgment
 Postcard”).Inadditiontoacknowledgingreceipt,thepostcardwillcontaintheclaimnumber
 forfuturereference.IfanAcknowledgementPostcardisnotreceived,thePotentialClaimant
 cancontacttheDistributionAgentviathetoll-freetelephonenumberoremailaddressstated
 intheNoticePacket. 
 SECv.ARCapitalLLC,et.al,
26. Claim Forms must be properly filled out per the instructions provided by the Distribution
 Agent and must be accompanied by such documentary evidence as the Distribution Agent
 deemsnecessaryorappropriatetosubstantiatetheclaim.Withoutlimitation,thisinformation
 mayincludethirdpartydocumentaryevidenceofacquisitionsoftheEligibleSecurityduring
 theRelevant Period,as well as holdings oftheEligibleSecurityat pertinent dates.
27.Whensubmittingclaims totheFair Fundon behalfof its clients,all Third-PartyFilers must
 usetheelectronicfilingtemplateprovidedbytheDistributionAgentinthismatter.Filesthat
 do not comply with the template and format provided by the Distribution Agent may be
 rejected. Third-PartyFilers must also submit a master proof of claim and release, as well as
 proofofauthoritytofileonbehalfofclaimant(s)atthetimetheelectronicfileoftransactions
 is submitted.Failuretodosomayresult inrejectionoftheclaim(s). 
28. Each Third-Party Filer must establish the validity and amount of each claim in its
 submission.Like all other claimants to the Fair Fund, Third-Party Filers must submit such
 supporting documentary evidence of purchases, dispositions, and holdings of the Eligible
 Security as the Distribution Agent deems necessary or appropriate to substantiate each
 individual claim. Without limitation, this includes the complete name of the claimant
 (beneficial account owner) and its TIN (for individuals) or EIN (for companies), sufficient
 contactinformationtoconfirmtheidentityofthebeneficialowner,anddocumentationfrom
 the original bank, broker or other institution of purchases and dispositions of the Eligible
 Security (account statements, confirmations and other documentation of purchases and
 dispositions) during the Relevant Period on their trade dates, as well as holdings of the
 Eligible Security on pertinent dates.Documentation generated by the Third-Party Filer as
 well as affidavits in lieu of supporting documentation will not be accepted, unless for good
 cause the Distribution Agent determines it acceptable. The Distribution Agent will have the
 right to request, and the Third- Party Filer will have the burden of providing to the
 Distribution Agent, any additional information and/or documentation deemed necessary by
 the Distribution Agent to substantiate the claim(s) contained in the submission.
 Documentationfrom aThird-PartyFilerthatisnotacceptabletotheDistributionAgent will
 result in rejection of the affected claim(s). The determination of the Distribution Agent to
 reject a claim for insufficient documentation is final and within the discretion of the
 DistributionAgent and maynot be appealed. 
29.Distributionpaymentsmustbemadebycheckorelectronicpaymentpayabletothebeneficial
 account owner. The Third-Party Filer shall not be the payee of any distribution payment
 check or electronic payment. Any other payment arrangement must be discussed with the
 Distribution Agent and must be authorized by the Claimant (beneficial account owner).
 CompensationtotheThird-PartyFiler forits services maynot be paidor deducted from the
 DistributionPayment. 
30.Custodians,trustees,orprofessionalsinvestingonbehalfofmorethanonePotentialClaimant
 inapooledinvestmentfundorentitywill berequiredtocompleteacertification,whichwill
 require them, at a minimum, to attest that any distribution to the custodian, trustee, or
 investment professional representingmultiple potentiallyeligible beneficial owners, will be
 SECv.ARCapitalLLC,et.al,
 allocated for the benefit of current or former pooled investors and not for the benefit of
 management. The certification form will be available on the Fair Fund website and upon
 requestfromtheDistributionAgent.Allsuchcustodians,trustees,orprofessionalsinvesting
 on behalf of more than one Potential Claimant in a pooled investment fund or entity must
 have an auditable mechanism available to the Distribution Agent and the SEC staff to
 confirm that each Claimant, if determined an Eligible Claimant, received the Distribution
 Payment directedto them. 
31. The Distribution Agent will review all claim submissions and determine the eligibility of
 each Potential Claimant to participate in the Fair Fund by reviewing the claim data and
 supporting documentation (or the lack thereof), verifying the claim, and determining each
 PotentialClaimant’sEligibleShareamountpursuanttothePlanofAllocation.EachPotential
 Claimant will have the burden of proof to establish the validityand amount of his,her or its
 claim, and that they qualify as an Eligible Claimant. The Distribution Agent will have the
 right to request, and the Potential Claimant will have the burden of providing to the
 DistributionAgent,anyadditionalinformationand/ordocumentationdeemedrelevantbythe
 DistributionAgent. 
 C. ClaimDetermination Processes 
32.TheDistributionAgentwillprovideaDeterminationNoticetoeachPotentialClaimantwho
 filed a claim, and to each Class Action Claimant, setting forth the Distribution Agent’s
 conclusions concerningsuchclaim. 
33. For those claims that are rejected in whole or in part, the Determination Notice will provide
 thereason(s)fortherejection(e.g.,failuretoproviderequiredinformationordocumentation,
 no Eligible Shares, etc.). The Determination Notice will also notify the Class Action
 Claimant or Potential Claimant of the opportunity to cure the rejection, if applicable, and
 provideinstructionsregardingwhatisrequiredtodoso.AnyClaimantwitharejectedclaim
 will have twenty(20) days from the date of the Determination Notice to cure anyrejections
 identified in the Determination Notice. Any Claimant seeking reconsideration of a rejected
 claim must advise the Distribution Agent in writing within twenty (20) days of the date of
 thenotice.Allrequestsforreconsiderationmustincludeawrittenrequestdetailingthereason
 forthereconsiderationononepageandthenecessarydocumentationtosubstantiatethebasis
 uponwhichtheClaimant is requestingreconsiderationoftheirclaim. 
34.Forthoseclaims that arein goodstanding,the DeterminationNoticewill providethe
 numberofEligibleShares totheClaimant. 
35. The Distribution Agent may consider requests for review of any claim determination
 presentedbyClaimants.Claimantswhorequestreviewmustprovideareasonfortherequest
 and documents supporting their claim. The Distribution Agent will investigate the request
 forreview,andwithinthirty(30)daysofreceiptofthewrittenrequest,theDistributionAgent
 will notify the Claimant of the final resolution of the review. The Distribution Agent will
 notify the Commission staff of any request for review that does not result in the resolution
 SECv.ARCapitalLLC,et.al,
 of the claim. The Distribution Agent will have the authority to waive technical claim
 deficiencies and approve claims on a case-by-case basis, or in groups of claims. All
 determinations made by the Distribution Agent in accordance with the Distribution Plan in
 any dispute, request for review, or request to cure a deficient claim will be final and not
 subject todispute. 
36. The Claimant has the burden of notifying the Distribution Agent of a change in his or her
 current address and other contact information, and of ensuring that such information is
 properlyreflectedinthe DistributionAgent’s records. 
37. A recipient of an Eligible Security as a gift, inheritance, devise or by operation of law will
 be eligible to file a Claim Form and participate in the distribution of the Fair Fund to the
 extent the original purchaser would have been eligible under the terms of this Distribution
 Plan. Only one claim may be submitted with regard to the same transactions in the Eligible
 Security, and in cases where multiple claims are filed by the donor and donee, the donee
 claim will behonored,assumingit is supportedbyproperdocumentation. 
38. Claims on behalf of a retirement plan covered by Section 3(3) of ERISA, 29 U.S.C. §
 1002(3), which do not include individual retirement accounts, and such plan’s participants,
 are properly made by the administrator, custodian or fiduciary of the plan and not by the
 plan’s participants. The Distribution Agent will issue anypayments on such claims directly
 totheadministrator,custodianorfiduciaryoftheretirementplan.Thecustodianorfiduciary
 of the retirement plan will distribute any payments received in a manner consistent with its
 fiduciarydutiesandthegoverningaccountorplanprovisions.Withrespecttoanyretirement
 plan that has been closed prior to the Distribution Agent’s identification of Claimants, the
 DistributionAgentwillendeavortodistributefundsdirectlytothebeneficialaccountholders
 of such retirement plans if the information required for such a distribution is known to or
 providedtotheDistributionAgent. 
IV. IndependentThird-PartyReview 
39. After the Distribution Agent has completed the process of analyzing the claims and
 determining Eligible Share numbers in accordance with the Plan of Allocation, and prior to
 thedistributionofanyfunds,theDistributionAgentwillengageanindependent,third-party
 firm, not unacceptable to Commission staff, to perform a set of agreed upon procedures,
 review a statistically significant sample of claims and ensure accurate and comprehensive
 applicationoftheDistributionPlan.TheDistributionAgent will communicatetheresults of
 the review to Commission staff together with any written analysis or reports related to the
 review, and, upon request, will make the firm available to the Commission staff to respond
 toquestions concerningthereview. 
V. Establishmentof theEscrow Account 
40. Prior to disbursement of the Fair Fund, the Distribution Agent will establish accounts
 described as follows at a U.S. commercial bank (“Bank”), not unacceptable to Commission
 SECv.ARCapitalLLC,et.al,
 staff. The Distribution Agent will establish an escrow account (the “Escrow Account”)
 pursuant toan escrow agreement (the “Escrow Agreement”)tobeprovided byCommission
 staff. The Escrow Account will be established to receive the monies from the Commission
 and the Fair Fund will be held in the Escrow Account until the time of distribution. The
 DistributionAgentwillalsoestablishaseparatedepositaccount(e.g.,controlleddistribution
 account, managed distribution account, linked checking and investment account) (the
 “Distribution Account”) for the purpose of funding the Distribution Payments to be
 distributed to Eligible Claimants. The accounts shall be in the name of and bearing the
 Employer Identification Number of the Fair Fund as custodian for the distributees of the
 Distribution Plan. The name of each account will be in the following form: “SEC v. AR
 Capital Distribution Fund, as custodian for the benefit of investors allocated a distribution
 pursuant totheAR Capital DistributionPlan.” 
41.DuringthetermoftheEscrowAgreement,ifinvested,theEscrowAccountshallbeinvested
 and reinvested in short-term United States (“U.S.”) Treasury securities backed by the full
 faith and credit of the U.S. Government or an agency thereof, of a type and term necessary
 tomeetthecashliquidityrequirementsforpaymentstoEligibleClaimantsortaxobligations
 that mayaccrue. This mayinclude investment or reinvestment in a bank account insured by
 the Federal Deposit Insurance Corporation (“FDIC”) up to the guaranteed FDIC limit, or
 investments in AAA-rated Money Market Mutual Funds registered under the Investment
 Company Act of 1940 that directly invest 100% of their assets in short-term U.S. Treasury
 securities and obligations, all backed by the full faith and credit of the U.S. Government;
 provided, however, that the AAA-rated Money Market Mutual Funds’ investments in short
 term U.S. Treasury securities will not be made through repurchase agreements or other
 derivativeproducts. 
42. In consultation with the staff of the Commission, the Distribution Agent will work with the
 Bank on an ongoing basis to determine an allocation of funds between the Escrow Account
 andDistributionAccount that willpreserveearnings,ifpossible,whileprovidingmaximum
 protectionforthe Fair Fund. 
43.All interest earnedwill accrue forthebenefit oftheFairFund. 
44. Upon receipt of the monies from the SEC into the Escrow Account, the Distribution Agent
 will provide a signed receipt to the Commission staff within ten (10) business days. The
 Commissionstaffwill filethereceipt withtheCourt. 
45.UpontransferfromtheSEC,theassetsoftheFairFundwillbeheldintheEscrowAccount,
 separate from Bank assets, until the presentation of checks. All Fair Fund checks presented
 for payment or electronic transfers will be subject to “positive pay” controls before theyare
 honored by the Bank. The “positive pay” system provides protection against fraud arising
 from counterfeit or altered checks. The “positive pay” system will require, at a minimum,
 confirmation by the Bank that all checks presented for payment match the identifiers and
 amounts on the payee list prior to honoring such checks. In each instance, funds will be
 SECv.ARCapitalLLC,et.al,
 transferredfromtheEscrowAccounttotheDistributionAccountontheBank’sconfirmation
 that apresented checkmatches therelevant “positivepay”criteria. 
46.TheDistributionAgentwillprovidecopiesofthebankand/orinvestmentstatementsonany
 accounts established bythe Distribution Agent to the Tax Administrator ona monthlybasis
 andwill assist theTax Administratorinobtaininganyotherstatements,as necessary.
VI. Distribution 
47. The Net Available Fair Fund will be distributed to Eligible Claimants with Eligible Shares
 as providedunderthe terms ofthis DistributionPlan.AnEligibleClaimant’s EligibleShare
 number, as determined in accordance with the Plan of Allocation contained in Appendix 1
 tothis Plan,will beusedtodeterminetheirDistribution Payment. 
48. The Distribution Agent will disburse the Net Available Fair Fund to all Eligible Claimants,
 inoneormoretranches,onceallClaimFormshavebeenprocessedandallClaimantswhose
 claimshavebeenrejectedordisallowed,inwholeorinpart,havebeennotifiedandprovided
 theopportunitytocurepursuant totheprocedures set forthherein. 
49. The Distribution Agent will prepare a list of all Eligible Claimants, the Eligible Share
 number, and the Distribution Payment of each Eligible Claimant (“Payment File”). The
 DistributionAgentwillworkwiththeTaxAdministratortopreparetherelevantmaterialsto
 effect a distribution, including determining an estimated distributable amount from the Fair
 Fundandestablishingaprudentreservetopayfederal,stateandlocaltaxes andthefeesand
 expenses of administration of the Tax Administrator and Distribution Agent payable in
 connectionwiththeFair Fund. 
50. After receipt and acceptance of the Payment File, the Commission staff will petition the
 CourtforauthoritytodisbursetherequestedbalanceoftheNetAvailableFairFundfromthe
 Commission to the Distribution Agent for distribution to Eligible Claimants pursuant to the
 Distribution Plan. In conjunction with any motion seeking approval of a distribution, the
 Payment Filewill,uponrequest,bemade availabletotheCourt underseal. 
51. Following the Court’s approval of the Commission’s petition for the authority to distribute
 the Net Available Fair Fund to Eligible Claimants with Eligible Shares as provided for in
 thisDistributionPlan,theDistributionAgentwillcommencethedistributionaspromptlyas
 possible. 
52.TheDistributionAgentwilldistributetheNet AvailableFairFundtotheEligibleClaimants
 baseduponaproratadistributionformula.AssetforthinthePlanofAllocationinAppendix
 1,thisformulaisthefractionoftheEligibleSharesnumberofeachEligibleClaimantdivided
 bythe aggregate Eligible Shares of all Eligible Claimants. No DistributionPayment will be
 made to an otherwise Eligible Claimant unless the amount to be paid equals or exceeds the
 de minimis amount of $10. After applyingthe pro rata distribution formula and eliminating
 the Eligible Claimants with a preliminary Distribution Payment of less than $10, KCC will
 SECv.ARCapitalLLC,et.al,
 recalculate the distribution of the Net Available Fair Fund for the remaining Eligible
 Claimants pursuant to the pro rata distribution formula described above to determine each
 final DistributionPayment. 
53. The Distribution Agent in its exclusive discretion may, but will have no obligation to,
 aggregateaccountsheldbyapersoninthesamelegalcapacityindeterminingEligibleShare
 amounts andDistributionPayment amounts. 
54. Checks will be issuedbythe Distribution Agent from the DistributionAccount set up at the
 Bank.CheckswillbeissuedinU.S.dollarsandbearastaledateofninety(90)daysfromthe
 date of issuance. Accordingly, checks that are not negotiated within this Check-cashing
 Periodwillbevoided,andtheissuingfinancialinstitutionwillbeinstructedtostoppayment
 on those checks, except as provided below. Where an Eligible Claimant’s check is not
 negotiated within the Check-cashingPeriod and has been voided bythe Distribution Agent,
 that Eligible Claimant’s claim will be extinguished. All such funds will remain in the Fair
 Fund. 
55. Payments to Eligible Claimants will be accompanied by a communication that includes, as
 appropriate: 
 a. Astatement characterizingthedistribution; 
 b. A statement that checks will be void and cannot be reissued after ninety (90) days
 from thedatetheoriginal checkwas issued; 
 c. A statement that reissued checks will expire on thirty (30) days from the date of the
 reissuedcheck; 
 d. A statement that the tax treatment of the distribution is the responsibility of each
 EligibleClaimantandthattheEligibleClaimantshouldconsulthisorhertaxadvisor
 foradviceregardingthetax treatment ofthedistribution; and 
 e. Contact information for the Distribution Agent for questions regarding the
 DistributionPayment. 
56. Distribution checks and/or accompanying communications will clearly indicate that the
 money is being distributed from a Fair Fund established to compensate investors for harm
 suffered as a result of their investment in ARCP. Any such communication, letter or other
 mailing to Eligible Claimants characterizing the distribution will be submitted to the
 CommissionstaffandtheTax Administratorforreviewand approval. 
57.WiretransfersmaybeutilizedatthediscretionoftheDistributionAgenttotransferapproved
 Distribution Payments to filers. Wire transfers will be initiated by the Distribution Agent
 using a two-party check and balance system, whereby completion of a wire transfer will
 require an authorization by two members of the Distribution Agent’s senior staff. Wire
 transfers will beexecutedinU.S.dollars,unless agreedtowiththeCommissionstaff.
58. Under no circumstances will the Distribution Agent, its employees or its agents incur any
 liability to any Person for making a distribution in accordance with the Order of the Court
 SECv.ARCapitalLLC,et.al,
 approving the distribution and the schedules of Eligible Claimants, and all Persons shall be
 enjoined from taking any action in contravention of this provision. Upon receipt and
 acceptance by an Eligible Claimant of a distribution from the Fair Fund, such Eligible
 Claimant will be deemed to have released all claims that such Eligible Claimant may have
 against the Distribution Agent, its employees, agents, and attorneys in connection with the
 Distribution Plan and the administration of the Fair Fund, and shall be barred from
 prosecutingorassertinganysuchclaims. 
VII. Post Distribution 
 A. Handlingof Returned orUn-cashed Checks 
59.TheDistributionAgent is authorizedtoreissuechecks toEligibleClaimants whoreceiveda
 distribution upon the receipt of a valid, written request from the Eligible Claimant. Such
 reissuedchecks will bevoidthirty(30)days from thereissuance. 
60. The Distribution Agent will research and attempt to locate all Eligible Claimants whose
 checks are returned to the Distribution Agent as undeliverable by the USPS. However, the
 Eligible Claimant has the burden of providing the Distribution Agent with any changes to
 his orhermailingaddress.TheDistributionAgent will mail areissued checktotheupdated
 address,subject tothetimelimits detailedherein. 
61.IncaseswhereanEligibleClaimantisunabletoendorseaDistributionPayment(e.g.,asthe
 resultofanamechangebecauseofmarriageordivorce,orastheresultofdeath),anyrequest
 by an Eligible Claimant or a lawful representative for reissuance of a Distribution Payment
 inadifferentnamemustbedocumentedtothesatisfactionoftheDistributionAgent.Ifsuch
 change is properly documented in the sole discretion of the Distribution Agent, the
 Distribution Agent will issue an appropriately redrawn Distribution Payment, subject to the
 timelimits detailedherein. 
62.TheDistributionAgentwillmakereasonableeffortstocontactEligibleClaimantswhowere
 mailed distribution checks to follow up on the status of un-cashed checks per thresholds
 agreed to with the Commission staff (other than those checks returned as “undeliverable”)
 andwilltakeappropriateactiontofollowuponthestatusofun-cashedchecksattherequest
 of Commission staff. The Distribution Agent may reissue such checks, subject to the time
 limits detailedherein. 
 SECv.ARCapitalLLC,et.al,
 B. Disposition of RemainingFunds 
63. After the initial distribution is completed, if additional funds still remain, the Distribution
 AgentshallinconsultationwithCommissionstaffdeterminewhetheritisfeasibletoconduct
 anotherdistributiontoEligibleClaimants whonegotiated their initial DistributionPayment,
 aftersettingasideareasonablereservefortaxes,fees andexpenses ofadministrationforthe
 Tax Administrator and Distribution Agent. Any additional distribution from the Fair Fund
 shall be conducted subject to the same procedure and limits described for the initial
 distribution,includingthe$10deminimis,without furtherCourt order. 
64. If, after the distribution is complete, all tax obligations of the Fair Fund have been satisfied,
 and funds remain in the Fair Fund, the Commission staff, in consultation with the
 Distribution Agent, will make a recommendation to the Court as to the disposition of the
 remainingfunds. 
VIII.TheDistribution Agent 
65. The Distribution Agent will be responsible for administering the Fair Fund in accordance
 with the DistributionPlan. This will include, amongother things, takingreasonable steps to
 identify and contact Potential Claimants; obtaining accurate mailing information for
 Potential Claimants; establishing a website and staffing a call center to address inquiries
 duringtheclaimsprocess;developingaclaimsdatabase;preparingaccountings;cooperating
 withtheTaxAdministratortosatisfyanytaxliabilitiesandtoensurecompliancewithincome
 tax reporting requirements; advising Claimants of deficiencies in claims and providing an
 opportunitytocureanydocumentarydefects;takingantifraudmeasures,suchasidentifying
 false, ineligible and overstated claims; making determinations under the criteria established
 herein as to Claimant eligibility; advising Claimants of final claim determinations; and
 disbursingthe Fair Fund inaccordance withthis DistributionPlan. 
66. To carry out the purposes of this Distribution Plan, the Distribution Agent is authorized to
 make and implement immaterial changes to the Distribution Plan upon agreement with
 Commissionstaff.IfachangeisdeemedtobematerialbyCommissionstaff,Courtapproval
 is requiredpriortoimplementationbyamendingtheDistributionPlan. 
67. The Distribution Agent may extend any procedural deadline contained in the Distribution
 Planforgood causeshown,ifagreeduponbythe Commission staff. 
68. The Distribution Agent is authorized to enter into agreements with institutions
 (“Institutions”) as may be appropriate or necessary in the administration of the Fair Fund,
 provided such Institutions are not excluded pursuant to other provisions of this Distribution
 Plan. In connection with such agreements, the Institutions shall be deemed to be agents of
 theDistributionAgent underthis DistributionPlan. 
69. The Distribution Agent will be entitled to reasonable administrative fees and expenses in
 connectionwiththeadministrationanddistributionoftheFairFund(includinganysuchfees
 SECv.ARCapitalLLC,et.al,
 and expenses incurred by agents, consultants or third parties retained by the Distribution
 Agentinfurtheranceofitsduties).TheDistributionAgentwillinvoiceallfeesandexpenses
 for the administration and distribution of the Fair Fund on a monthly basis directly to
 Commissionstaff. 
70.Intheinterestsofpayingtheadministrationfeestimely,distributingfundsexpeditiouslyand
 conserving resources of both the Court and the SEC, the Commission staff is authorized to
 review, approve and pay all future fees and expenses of the Distribution Agent from the
 DistributionFund,withoutfurtherapplicationororderfromtheCourt.Allsuchpaymentsof
 fees and expenses shall betrackedandreportedto theCourt inafinal accounting.
71. The Distribution Agent may be removed at any time by the Court, and replaced with a
 successor. In the event the Distribution Agent decides to resign, it will first give written
 notice to the staff of the Commission and the Court of such intention, and such resignation
 will not be effective until the Court has appointed a successor. The Distribution Agent will
 then follow such instructions as such successor or the Court provides in turning over
 management ofthe Fair Fund. 
72. The Distribution Agent will retain all claims materials in paper and electronic form for a
 period of six (6) years after approval of the final report and final accounting and thereafter
 will transfer the documents to the Commission, pursuant to Commission staff direction. In
 addition, the DistributionAgent will shut down the website, P.O. Box and customer service
 telephone line(s) established specifically for the administration of the Fair Fund three (3)
 months after the closing of the Escrow and Distribution Accounts, or at such earlier time as
 theDistributionAgent determines withconcurrenceoftheCommissionstaff. 
IX. TaxCompliance 
73.TheFairFundisaQualifiedSettlementFund(“QSF”)underSection468B(g)oftheInternal
 RevenueCode,26U.S.C.§468B(g),asamended.TheTaxAdministratoristheadministrator
 ofsuchQSFforpurposesofTreas.Reg.§1.468B-2(k)(3)(I),andshallsatisfythetaxrelated
 administrative requirements imposed by Treas. Regs. § 1.468B-1 to § 1.468B-5, including,
 but not limitedto: 
 a. Obtainingataxpayeridentificationnumber; 
 b. Submitting requests for funds from the Fair Fund that are necessary for the timely
 payment of all applicable taxes, making timely payment of taxes for which the Tax
 Administratorhas receivedfunds,andfilingall applicablereturns; and 
 c Satisfyinganyinformation,reporting,orwithholdingrequirements inconnectionwith
 thedistributionoftheFairFund. 
74. The Distribution Agent will work cooperatively with the Tax Administrator and timely
 provide requested information needed by the Tax Administrator to meet the information
 reportingandtax payment obligations oftheFair Fund. 
 SECv.ARCapitalLLC,et.al,
75. All fees, costs and expenses of the Tax Administrator will be paid by the Fair Fund as part
 of the cost of the administration of the Fair Fund. Any taxes on interest earned by the Fair
 Fundwill bepaidbythe Fair Fund. 
X. Fair Fund Reportingand Accounting 
76. The Distribution Agent will provide to Commission staff, who will file with the Court, a
 quarterlystatusreportwithinforty-five(45)daysofCourtapprovalofthisDistributionPlan,
 and will provide additional reports and quarterly account statements within thirty(30) days
 afterthe endofeveryquarterthereafter as detailedbelow. 
77 Once the moneyhas been transferred to the Escrow Account, a quarterly account statement,
 inaformattobeprovidedbytheCommissionstaff,shallbesubmittedwiththestatusreport
 bytheDistributionAgent. 
78. The status report and quarterly account statement will inform the Court and the staff of the
 CommissionoftheactivitiesandstatusoftheFairFundduringtherelevantreportingperiod,
 andoncefunds aretransferredtothe DistributionAgent will specify,at a minimum:
 a. Thelocationofthe account(s)comprisingthe Fair Fund; and 
 b. Aninterim accountingof all monies intheFair Fundas ofthemost recent month-end,
 includingthevalueoftheaccount(s),allmoniesearnedorreceivedintotheaccount(s),
 funds distributed to Eligible Claimants under this Distribution Plan, and any monies
 expended from the Fair Fund to satisfy any fees, costs, taxes and other expenses
 incurredintheimplementationofthis DistributionPlan. 
79. The Distribution Agent will prepare a final report and final accounting, in a format to be
 provided by the Commission staff, when the Fair Fund administration is complete. In
 compiling the final accounting, the Distribution Agent will coordinate with the Tax
 Administrator. The Commission staff will file the final report and final accounting with the
 Court. 
80.Commissionstaff,orotherrelevantparty,shall providetheDistributionAgentwithanyand
 all account information relating to the Fair Fund that may be required to meet reporting
 obligations,includingprovidingcopiesofanyaccountstatementsthattheDistributionAgent
 mayrequest. 
XI. Termination of theFair Fund 
81. Once all Distribution Payments have been negotiated or voided, anyfunds remainingin the
 Escrowand DistributionAccounts will betransferredtotheSEC. 
 SECv.ARCapitalLLC,et.al,
82.TheFairFundwillbeeligibleforterminationandtheDistributionAgent willbeeligiblefor
 discharge after all ofthe followinghaveoccurred: 
 a. Afinal report andaccountinghas beensubmittedtoandapprovedbytheCourt;
 b. All taxes havebeenpaid; and 
 c. All remainingfunds have beendisposedof as approvedbytheCourt. 
83. Once the Fair Fund has been terminated, no further reissue requests will be allowed and no
 additional payments will bemadewhatsoever. 
XII. Limitation of Liability 
84. The Court may amend this Distribution Plan; and retains exclusive jurisdiction over all
 claimsarisinginconnectionwiththisDistributionPlan,including,butnotlimitedto,claims
 against the Distribution Agent asserting liability for violation of any duty imposed by this
 DistributionPlanorotherCourt order. 
85. The Distribution Agent is entitled to rely on all outstanding rules of law and Court orders.
 TheDistributionAgent willnotbeliabletoanyone,excepttheCommissiononbehalfofthe
 Fair Fund for a pecuniary loss to the Fair Fund, for any action taken or omitted by the
 Distribution Agent in connection with the Distribution Plan and all Potential Claimants and
 Class Action Claimants will have no claims against the Distribution Agent, its employees,
 agents, and attorneys in connection with the Distribution Plan and the administration of the
 Fair Fund, and will be deemed enjoined from prosecuting or asserting any such claims,
 except upon a finding by this Court of gross negligence or reckless disregard of dutyunder
 this DistributionPlan. 
86. The submission of the Claim Form and/or the receipt and acceptance of a Distribution
 Payment byan Eligible Claimant will not affect an Eligible Claimant’s rights and claims as
 against any party (other than the Distribution Agent), including, without limitation, AR
 Capital, Schorsch, Block, and AR Capital’s past or present directors, officers, employees,
 affiliates,nominees, creditors,advisors andagents. 
 SECv.ARCapitalLLC,et.al,
Appendix1–FairFund Plan of Allocation 
This Plan of Allocation is designed to compensate Eligible Claimants based on their losses on
shares of the ARCP common stock purchased or otherwise acquired at inflated prices at various
points in time during the Relevant Period due to the misconduct of the Defendants, and held
through the close of trading on October 28, 2014. Investors who did not purchase or otherwise
acquire shares of the Eligible Security during the Relevant Period are ineligible to recover under
this Plan. 
EligibleShares will becalculatedas follows: 
Shares of ARCP common stock purchased or otherwise acquired on or after February 28, 2013,
includingintheT3merger,andsuchshares areheldat closeoftradingon October28,2014.
FIFO Methodology: For each Claimant who made multiple acquisitions and sales of the Eligible
Security during the Relevant Period, the transactions will be matched according to the first-in,
first-out (“FIFO”) method. The earliest sales during the Relevant Period will be matched first
against anyholdings at the opening of the Relevant Period (the “Beginning Holdings”). Once the
Beginning Holdings have all been matched, or in the event that the Claimant had no Beginning
Holdings,thenanyfurthersaleswouldbematchedagainsttheearliestRelevantPeriodacquisitions
andchronologicallythereafter. 
Transfers:ThereceiptorgrantoftheEligibleSecuritytotheClaimantbygift,devise,inheritance,
or operation of law during the Relevant Period is not considered an eligible acquisition if the
original purchase or acquisition did not occur during the Relevant Period. Such shares will be
excludedfrom thecalculationoftheClaimant’s EligibleShares. 
Pro Rata Distribution Payment: Each Eligible Claimant’s preliminary Pro Rata Distribution
Payment will be determined by dividing the Eligible Claimant’s total number of Eligible Shares
by the total Eligible Shares of all Eligible Claimants and multiplying that fraction by the total
amount of the Net Available Fair Fund identified for distribution. No Distribution Payment will
be made to an otherwise Eligible Claimant unless the amount to be paid equals or exceeds the de
minimis amount of $10. After applying the pro rata distribution formula and eliminating the
Eligible Claimants with a preliminary Distribution Payment of less than $10, the Distribution
Agent will recalculate the distribution of the Net Available Fair Fund for the remaining Eligible
Claimants pursuant to the pro rata distribution formula described above to determine each final
DistributionPayment. 
 SECv.ARCapitalLLC,et.al,